## POTTS *v.* WALLACE.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF NEW YORK.

No. 41. Argued November 14, 1892. — Decided December 12, 1892.

The directors of a corporation organized under the laws of Pennsylvania voted to make an assignment of the property of the corporation for the benefit of its creditors, which vote was ratified by the stockholders. They further voted to make a mortgage to secure a claim of one of the directors as a preferred claim. The assignment was made without making the mortgage. In an action by the assignee to enforce payment from a stockholder of his subscription to the stock, *held*, that the defendant could not set up the failure to make the mortgage as invalidating the assignment.

When the assets of an insolvent corporation, organized under the laws of Pennsylvania, fail to meet the liabilities of the company by an amount equal to or greater than the sum due the company from a stockholder by reason of unpaid subscriptions to his stock, the assignee has an action at law against him to recover such unpaid subscriptions without first resorting to equity for an assessment.

In an action against a stockholder in an insolvent corporation to recover unpaid subscriptions to his stock for the benefit of creditors, it is no defence to show that when the corporation was solvent he offered to pay in full and his offer was declined, if it also further appear that he refused to be absolved from his contract, and stood upon his rights as a stockholder until the company became embarrassed.

When the plaintiff's evidence makes out a *prima facie* case, and the defendant, after going into his evidence, does not go to the jury on the question of fact, he abandons his defence, so far as it depends on his own evidence, and takes the position that the plaintiff's evidence does not make out a case.

THIS was an action brought originally in the New York Supreme Court, and afterwards removed into the Circuit

Court of the United States for the Eastern District of New York, by Henry Potts, Jr., as assignee of the Chester Tube and Iron Company, plaintiff, against William H. Wallace.

The Chester Tube and Iron Company was a corporation of Pennsylvania, duly incorporated under the provisions of an act of assembly of that State, approved April 29, 1874, entitled "An act to provide for the incorporation and regulation of certain corporations," for the purpose of the manufacture of iron or steel, or of any article of commerce made from them. The place where the business of the corporation was to be transacted was Chester, Delaware County, in the State of Pennsylvania, and the capital stock was fixed at one hundred thousand dollars, divided into two thousand shares of the par value of fifty dollars each. The whole amount of the capital stock was subscribed for by the defendant, William H. Wallace, and six other persons, who had associated themselves together for the purpose of forming the corporation. The charter or agreement of association was dated the 13th day of December, 1877, and letters patent were issued by the governor of Pennsylvania on the 5th day of January, 1878. The charter was signed by the associates, and William S. McManus, Augustus B. Wood, William H. Wallace, Patrick Reilly, and John Shotwell were named therein as directors for the first year.

In and by this charter the defendant Wallace subscribed for three hundred shares of the stock, and he continued to hold his position as director of the company until the 6th day of July, 1880, when, at a meeting of the board then holden, he resigned, his resignation was accepted, and on the 14th day of July, 1880, one F. C. Shotwell was elected to take his place. There was no meeting of the board of directors from January 21, 1880, to July 6, 1880.

At a meeting of the board on August 3, 1880, the following resolution was adopted:

"Whereas it has become apparent that, in order to enable this company to meet its liabilities, some indulgence on the the part of its creditors is necessary, therefore, resolved, that the president is authorized to negotiate for and effect an exten-

sion of the claims against the company upon such terms as he may deem most likely to make it meet its indebtedness; and in the event of his failure to accomplish such extension, the president is authorized to execute, under the corporate seal, with his attestation, a deed of general assignment for all the estate and property of the company for the benefit of its creditors *pro rata* and without preference."

On the 14th day of September, 1880, a deed, purporting to be a deed of assignment by the Chester Tube and Iron Company, by its president, William S. McManus, under its seal, was executed to Henry Potts, Jr., and was recorded the same day in the recorder's office of Delaware County, Pennsylvania. This deed purported to convey and transfer to Henry Potts, Jr., as assignee, all the property and estate of the company of every description, in trust, to sell and dispose of the same, and to collect all the claims of the company, conduct all the steps necessary for the purpose of converting the assets into cash, and to divide the same without preference among the creditors of the corporation, with the further provision that should there be any surplus, after paying the debts, the same should be returned to the corporation.

In pursuance of the provisions of the Pennsylvania statutes, regulating such assignments, Henry Potts, Jr., on October 20, 1880, executed his bond, conditioned for the faithful performance of his duties as assignee, in the penalty of $191,000, which bond was approved by the Court of Common Pleas of Delaware County. Henry Potts, Jr., assumed the trust and proceeded with the execution of the same so far as to file an account, which account was confirmed by the court of Delaware County. On the 5th of March, 1882, a petition was filed in said court, alleging the death of Henry Potts, Jr., and, on the same day, an order was made appointing Henry W. Potts as assignee to fill the vacancy occasioned by the death of Henry Potts, Jr., and directing him to give a bond, with sureties, in the sum of $44,000, and such bond was filed on March 6, 1882; and on December 16, 1882, the Supreme Court of New York, County of Kings, in which the action brought by Henry Potts, Jr., against the defendant Wallace was still pending, ordered that

Henry W. Potts, as assignee of the Chester Tube and Iron Company, be substituted as plaintiff in the place of Henry Potts, Jr., deceased.

On the 22d day of June, 1883, on the petition of Henry W. Potts, assignee, the said action was removed to the Circuit Court of the United States for the Eastern District of New York, and at the May term, 1888, came on to be tried before the Hon. E. Henry Lacombe, Circuit Judge, and a jury, and resulted in a verdict for the defendant on the 9th day of May, 1888.

On February 5, 1889, judgment was entered on the verdict in favor of the defendant and against the plaintiff, and on the 5th day of April, 1889, a writ of error was allowed and the cause was brought thereby into the Supreme Court of the United States.

The record discloses, in addition to the foregoing facts, that the defendant's answer admitted that he had subscribed for three hundred shares of stock, had not paid anything on account of the same, and that demand for payment had been made on him by the plaintiff as assignee.

To meet the *prima facie* case thus made out against him, the defendant put in evidence proceedings of the stockholders on August 12, and of the board of directors on August 20. At these meetings the president and treasurer were directed to execute and deliver to A. B. Wood, trustee, a bond and mortgage of the company for $11,200, to secure money advanced by him, as trustee for John E. and Mary D. Browning, for the use of the company, and also to assign to A. B. Wood all the company's interest in the leasehold, machinery and fixtures of the company, in payment of $12,260, due Wood for money advanced by him individually for the use of the company. The resolutions of the stockholders and of the directors, at these meetings directed the president that, after the mortgage and assignment to A. B. Wood were executed and delivered, he should execute the deed of general assignment provided for by the resolution of August 3, 1880.

The defendant likewise put in evidence, under objection by the plaintiff, the proceedings of a meeting of the directors held

on September 16, 1880, wherein resolutions were passed declaring the act of the president in executing and delivering the deed of assignment to have been void and without authority, and in fraud of the rights of the company, and contrary to the will of the directors and stockholders. These resolutions further provided that the said pretended assignment should be repudiated, that notice of this action should be given to Henry Potts, Jr., and that the president should be and was removed from office, and D. F. Houston elected to take his place.

The defendant likewise offered evidence tending to show that several times during the year 1879 and early in 1880, when the affairs of the company were in an apparently prosperous condition, he offered to pay to the treasurer of the company the amount of his subscription, $15,000, and demanded his stock; that the treasurer, acting, as he testified, under directions of the president, refused to accept the money and to deliver the stock. The defendant likewise proved his resignation as director on July 6, 1880.

The record further discloses that, after the defendant had put in the foregoing evidence, the plaintiff called W. S. McManus, the president, who testified that he had never refused to accept defendant's subscription money or to deliver the stock, and that he gave no instructions to the treasurer to refuse defendant's payment or to refuse to deliver his stock. He also testified that he continued to consult with the defendant about the affairs of the company down until July, 1880.

The record further shows that, on the closing of the testimony, it was conceded by the counsel for the plaintiff and the defendant respectively that there was no question of fact to be submitted to the jury; that thereupon the counsel for the plaintiff requested the court to direct the jury to find a verdict for the plaintiff, which request was denied, and this ruling was excepted to; that the court, on motion of defendant's counsel, directed a verdict in favor of the defendant; and that the plaintiff's counsel duly excepted to the ruling in that behalf. The jury, under the direction of the court, found a verdict for the defendant.

*Mr. Sidney Ward* for plaintiff in error.

*Mr. B. F. Tracy* for defendant in error.

I. All duties and obligations imposed upon the defendant by his subscription were fully discharged and cancelled by the refusal on the part of the company, while it continued solvent, to receive the payment and performance tendered.

(*a*) The contract of subscription between the defendant and the company was a mutual contract and gave rise to mutual obligations and duties.

That the subscription, at its date, was a valid contract, is not disputed. *Richmondville Union Seminary* v. *MacDonald*, 34 N. Y. 379, 381; *Parker* v. *Northern Central Michigan Railroad*, 33 Michigan, 23; *Marsh* v. *Burroughs*, 1 Woods, 463; *Burrall* v. *Bushwick Railroad*, 75 N. Y. 211; *Pittsburgh & Connellsville Railroad* v. *Graham*, 36 Penn. St. 77; *Custar* v. *Titusville Gas & Water Co.*, 63 Penn. St. 381; *Melvin* v. *Hoyt*, 52 N. H. 61.

(*b*) The contract of subscription being one of " sale and purchase " the obligation on the part of the defendant to pay his subscription was fully discharged at the time he tendered performance, and the same was refused.

Upon tendering the property and after giving the buyer a reasonable time to accept the property and pay for the same, the seller may regard the contract as abandoned by the purchaser, he being put in default by his refusal to pay. *Westfall* v. *Peacock*, 63 Barb. 209; *Des Arts* v. *Leggett*, 16 N. Y. 582; *Billings* v. *Vanderbeck*, 23 Barb. 546; *Slingerland* v. *Morse*, 8 Johns. 474.

(*c*) The defendant took all necessary steps to release himself from liability as a stockholder. In view of the action taken by the treasurer and president, a formal tender by the defendant of the amount of his subscription was not necessary. The defendant on several occasions demanded his stock of the treasurer and offered to pay for the same, but in every instance the treasurer, acting under the instructions of the president, refused to issue the stock. A further tender.

became unnecessary, when it was reasonably certain that the offer would be refused. *Hills* v. *Albany Exchange Bank*, 12 Fed. Rep. 93; *Currie* v. *White*, 45 N. Y. 822; *Woolner* v. *Hill*, 93 N. Y. 576.

It was within the province of the president and treasurer of the corporation to issue the stock, they being authorized by the by-laws to sign all certificates of stock, and their refusal to issue stock was the refusal of the properly authorized agents of the corporation.

(*d*) It is conceded that the general rule of law in regard to unpaid stock subscriptions is that "unpaid subscriptions to stock are assets, and have frequently been treated by courts of equity as if impressed with a trust *sub modo* in the sense that neither the stockholders nor the corporations can misappropriate subscriptions so far as creditors are concerned."

But the equities of creditors are not regarded to the exclusion of all other equities. In the absence of statutes creditors may have equitable claims against stockholders, but not legal rights. Cases may and do arise where the right of a subscriber to be released from his obligation is paramount to any rights of creditors.

We do not doubt that a subscriber to the capital stock of the company cannot be discharged from the obligation which he has assumed until payment has been actually made, or the obligation to pay has been extinguished in some lawful manner. And we further concede that where the obligation to pay exists, any arrangement between the company and its debtor, by which a fictitious payment is attempted to be substituted for an actual payment, is a fraud upon the creditors, and may be disregarded by a receiver in bankruptcy, and the payment of the balance actually due enforced. There is no reported case that goes beyond this.

Wherever a pretended payment has been set aside and disregarded, it has been put on the express ground that the alleged payment was a fiction, and made in fraud of the creditors of the corporation. No such question is involved in the case at bar.

The defendant was a subscriber for the stock of the cor-

poration; payment of this subscription could not be enforced except by tender of the stock. The promise of the corporation to deliver the stock was the consideration of the defendant's promise to pay. The contract was executory. When the defendant offered to pay and demanded his stock and the corporation refused to deliver it, the corporation violated its contract and the defendant was discharged therefrom.

At the time of the bankruptcy, the defendant had ceased to be a subscriber for the stock. He was under no obligation whatever to the corporation. Of course, if it could be alleged that this was a mere device for the purpose of relieving the defendant from his obligation, a different question would be presented. No such thing is pretended. This distinction is pointedly made by Grover, J., in *Mills* v. *Stewart*, 41 N. Y. 384, 386. See also *Small* v. *Herkimer Manufacturing Co.*, 2 N. Y. 330; *Sawyer* v. *Hoag*, 17 Wall. 610; *Clark* v. *Bever*, 139 U. S. 96, 113; *Handley* v. *Stultz*, 139 U. S. 417, 430; *Pacific Bank* v. *Eaton*, 141 U. S. 227.

II. In any event the plaintiff has mistaken his remedy. There is no foundation for an action at law.

This is an action at law in the nature of debt to recover from the defendant the full amount of the capital stock for which he had at one time subscribed. Conceding for the sake of the argument, that the breach by the corporation of the contract of subscription might not relieve him from liability to certain creditors, it is plain that, as between the defendant and the corporation, its refusal to accept his money and deliver him his stock would prevent it from suing him on his subscription, and therefore the plaintiff cannot recover in its right.

At common law an assignee of an insolvent corporation could recover from a stockholder only when the corporation itself could have recovered if the assignment had not been made.

The corporation law of Pennsylvania, under which the Chester Tube and Iron Company was organized, provides that the officers and stockholders organized under or accepting the provisions of the act shall not be individually liable for the debts of the corporation otherwise than in the act provided.

The act provides for making stockholders parties to an action against the corporation, the levying of an execution against the corporation, and, if it be returned unsatisfied, that the deficiency may be satisfied out of the property of the stockholders so made parties, etc.

This liability, whether limited or not, is a security provided by law for the benefit of creditors, over which the corporation has no control; and, consequently, an attempted assignment by the corporation of the statutory liability of shareholders is inoperative, although made for the equal benefit of all the creditors. *Wright* v. *McCormack*, 17 Ohio St. 86; *Dutcher* v. *Marine Bank*, 12 Blatchford, 435; *Lane's Appeal*, 105 Penn. St. 49; *Bell's Appeal*, 105 Penn. St. 88.

It is evident on the face of the complaint that the statutory liability has not been pursued. The remedy of the plaintiff, if he has any against this defendant, is in equity. The complaint does not contain the allegations necessary for a bill in equity. See also *Terry* v. *Anderson*, 95 U. S. 628; *Mills* v. *Scott*, 99 U. S. 25; *Hatch* v. *Dana*, 101 U. S. 205; *McLean* v. *Eastman*, 21 Hun, 312; *Chandler* v. *Keith*, 42 Iowa, 99.

III. The assignment was invalid. It was made by the president pursuant to a resolution of the board of directors and he did not follow the instructions, conditions and authority contained in the resolution.

IV. This is not a question of irregularity which the company could waive, but a question of defect of title. If the president had no power to execute the assignment as he did, then the plaintiff obtained no title, and he cannot maintain this action, for his own proof discloses the defect of title.

V. The plaintiff cannot secure a reversal of this judgment upon the ground that there was any issue of fact which the court should have submitted to the jury.

MR. JUSTICE SHIRAS delivered the opinion of the court.

The assignments in error are nineteen in number, but they present substantially but one question: Did the court err, in view of all the evidence, in directing the jury to find a verdict for the defendant?

There were no findings of fact by the court or jury, and no charge or opinion of the court is shown by the record. We are therefore left to draw the materials upon which we are to revise the judgment of the court below from the various offers of evidence and exceptions thereto, read in the light afforded by the respective briefs and arguments of counsel.

Taken in logical order, the first ground of defence is found in the position that the assignment to Potts for the benefit of creditors was invalid, and the want of validity is supposed to be found in the fact that, in executing the deed of assignment, the president did not follow certain instructions and conditions imposed upon him by the board. Undoubtedly, the act of the president, in executing and delivering the deed of assignment, was fully warranted by the resolution of the board of August 3, 1880; but it is claimed that, by reason of proceedings at the stockholders' meeting, held on August 12, and at a meeting of the board of directors on August 20, the authority of the president, granted by the resolution of August 3, was modified, or made conditional on certain other acts that he was to do.

At the stockholders' meeting a resolution was passed directing the president, directors and officers of the company to execute a bond and mortgage to secure A. B. Wood, one of the directors, for certain trust moneys he had advanced to the company, and also to make an assignment to said board of the leasehold and fixtures of the company in payment of moneys alleged to have been advanced by him for the use of the company.

The resolution of the board of directors of August 3, authorizing the president to make a deed of assignment for the benefit of creditors, was laid before the stockholders, and, upon motion, was approved and ratified; and the president was authorized to execute a general assignment after the mortgage and assignment of lease to A. B. Wood should be duly executed and delivered.

At the meeting of the board, held on August 20, 1880, the action of the stockholders in directing the execution of a mortgage and assignment of the lease to A. B. Wood was reported, and was, by a resolution, approved.

It would seem that the mortgage and assignment of lease to Wood were never executed, and that the president on September 14, 1880, executed and delivered the deed of assignment to Potts.

As already stated, this action of the president in making the deed of assignment, without the mortgage and assignment to Wood having been executed, was sought to be repudiated by the board at a meeting held on September 16, 1880.

Whether the proposition to secure Wood, one of the directors of an insolvent company, by a mortgage covering all the property of the company, would have been valid as against the other creditors of the company, is more than doubtful. However that may be, the record does not show that any steps were ever taken to prevent the assignment to Potts from taking effect. There is no evidence that Potts was ever notified of the action of the directors, attempting to make the deed of general assignment subject to a prior mortgage and assignment in favor of Wood. Nor does it appear that any effort was made in the court having jurisdiction of the subject to set aside the deed to Potts. On the contrary, it appears that the assignee was suffered to proceed in the execution of his duties as assignee by filing his bond and inventory and an account, and, upon the death of Henry Potts, Jr., no objection was made on behalf of Wood or the company to resist the appointment of a successor.

The proposition that Wallace, when called upon by the assignee to pay for his stock, could take refuge in the abortive attempt of the directors to prefer one of their own number, seems to us to be altogether inadmissible.

Another ground of defence urged was that the plaintiff had mistaken his remedy; that the proceeding to enforce the liability of Wallace should have been by a bill in equity.

We might dismiss this position by the observation that it does not appear to have been taken by the defendant in his answer, or to have been brought to the attention of the court at the trial.

As, however, for other reasons, the case has to go back for another trial, it may be well for us to briefly consider the merits of the suggestion.

It is undoubtedly true that, in Pennsylvania, in the case of an insolvent corporation, its assets, including unpaid capital stock, constitute a trust fund, and that such fund cannot be appropriated by individual creditors, by means of attachments or executions directed against particular assets, but should be distributed, on equitable principles, among the creditors at large.

Accordingly, it was ruled by the Supreme Court of Pennsylvania in *Lane's Appeal*, 105 Penn. St. 49, and in *Bell's Appeal*, 105 Penn. St. 88, cases cited by defendant's counsel, that a bill in equity is a 'proper remedy whereby to subject the property of an insolvent corporation to the claims of its creditors.

Some general expressions were used in those opinions, cited in the brief of defendant's counsel, which seem to countenance the proposition that the only remedy in each case is by a bill in equity. But an examination of the facts of the cases and of the reasoning of the opinions clearly shows that what the court meant was that the proceeding must, in some form, be a remedy for all, and not for some, of the creditors — that the remedy must be coextensive with the nature of the property as a trust fund.

That this is the proper reading of those cases is shown by the later case of *Citizens' Savings Bank* v. *Gillespie*, 115 Penn. St. 564, 572. That was the case of a suit brought by an assignee of an insolvent bank for the benefit of creditors against a subscriber for stock remaining unpaid, and the Supreme Court, per Paxson, C. J., said:

"There being no assessment in evidence, the learned judge left it to the jury to find whether the whole of the unpaid subscription was required to pay the debts of the company. We see no error in this. If the unpaid subscriptions were required to pay the creditors, no assessment was necessary, under the authority of *Yeager* v. *Scranton Trust Company*, (14 Weekly Notes of Cases, 296.) . . . . It was there said that 'the uncontradicted evidence shows that it was necessary to collect the whole of this stock subscription in order to pay the sums due the depositors of this insolvent corporation.'

There is not even an apparent conflict between the case referred to and the later cases of *Lane's Appeal*, 105 Penn. St. 49, and *Bell's Appeal*, 115 Penn. St. 88, 564. Those were creditors' bills, filed against insolvent corporations, to compel the payment by the stockholders of their unpaid subscriptions, and it was held that, in such cases, there must be an account taken of the amount of debts, assets and unpaid capital, and a decree for an assessment of the amount due by each stockholder. The reason of this is plain. Upon the insolvency of a corporation a stockholder is liable for only so much of his unpaid subscription as may be required to pay the creditors. Hence, he may not be called upon in an arbitrary way to pay any sum that an assignee or creditor may demand. It is, therefore, requisite to ascertain, in an orderly manner, the extent of the stockholders' liability before proceedings are commenced to enforce it. But the necessity for this does not exist when the whole amount is required to pay the debts. Hence, *in such cases*, as was said in *Yeager* v. *Scranton Bank*, *supra, an assessment is not essential. The assignee may sue at once, for all is required.*"

At the trial in the present case, (see page 27 of the record,) the counsel for the defendant consented to take the statement of the company's clerk, without contradicting it, that the assets of the company appeared to be $250,000 and the liabilities $270,000 to $275,000. It was not necessary, therefore, to have a preliminary assessment against Wallace, as the jury could have found, under the concession of his counsel, that the entire amount of his unpaid stock was necessary to meet the indebtedness of the corporation. We understand the concession to mean that the debts exceeded the assets, including the unpaid subscriptions of the defendant and the other stockholders. If we are wrong in this, the defendant can show the facts, and invoke, if he be so advised, the doctrine of *The Savings Bank* v. *Gillespie*, if, indeed, that doctrine will avail him.

We are now brought to the last and most substantial ground urged by the defence, the one on which, we may conjecture, that the court below chiefly relied in directing the jury to find

their verdict for the defendant. It is thus expressed in the brief of the defendant's counsel:

"All duties and obligations imposed upon the defendant by his subscription were fully discharged and cancelled by the refusal on the part of the company, while it continued solvent, to receive the payment and performance tendered."

It may be readily conceded that if the evidence in the case disclosed that the defendant's offer of payment and performance was refused by the company while solvent, and that the defendant availed himself of such refusal, and declared himself off from his contract of subscription, the defendant was thereby exonerated from the obligation of his subscription, and that his liability to pay would not be revived by the subsequent insolvency of the company and by the demands of the assignee.

The record discloses a very different state of facts.

The defendant was himself one of the original corporators, and was, by the articles of association, made one of the directors of the company. This position he continued to occupy until July 6, 1880, which date, according to the uncontradicted evidence, was subsequent to the actual insolvency of the company.

John Shotwell testified that he was treasurer and secretary of the company from the time of its organization to its failure; that he ascertained that the company was in embarrassed circumstances in the spring of 1880 ; that he had a habit of going to the defendant's office, and talking with him about the company's affairs; that the company's notes went to protest in August. The resolution of the board to make the assignment for the benefit of creditors was adopted on August 3, 1880. Certainly, up until July 6, 1880, Wallace indicated no intention to withdraw himself from the company. On the contrary, he continued, from time to time, to declare his readiness to pay his subscription and to stand on his rights as a stockholder. He himself testified that he learned that the company was in trouble in June, 1880; that the president consulted with him in regard to the company's affairs after that ; that these consultations continued down to two or three

months before the final collapse; that defendant's firm continued to be agents of the company up to the time of its failure; and that what he was seeing the president about was business connected with the company, the selling of goods and collecting of accounts due, etc.; and that so long as he considered the stock good he was ready to take it and pay for it.

Even, therefore, if the company had, while solvent, refused to receive payment and to issue a certificate of stock, the evidence shows that the defendant did not elect to declare himself absolved from his contract, but stood upon his rights, as a stockholder and director, until the company's affairs had become involved in embarrassment. It was then too late for the defendant to change his position. If, on August 3, 1880, the day on which the directors resolved to make an assignment, the affairs of the company had been prosperous and its stock valuable, Wallace was still in a position to demand his stock and to compel payment to himself of any dividends that might be declared.

So that, even if the company and the defendant had then agreed that the latter should then be exonerated from his liability to the company, such an agreement would have been void as against the creditors of the insolvent company. In Sawyer v. Hoag, Assignee, 17 Wall. 610, it was held that the relations of a stockholder to the corporation, and to the public who deal with the latter, are such as to require good faith and fair dealing in any transaction between him and the corporation, of which he is part owner and controller, which may injuriously affect the rights of creditors or of the general public, and a rigid scrutiny will be made into all such transactions in the interest of creditors; and that it was not competent for the insolvent company to make a valid agreement with a stockholder to exonerate him from his liability. In other words, the doctrine laid down was that the governing officers of a corporation cannot, by agreement, or other transaction with the stockholder, release the latter from his obligation to pay, to the prejudice of its creditors, except by fair and honest dealing and for a valuable consideration.

In Hawley v. Upton, 102 U. S. 314, 316, it was said. per

Waite, C. J., that "it cannot be doubted that one who has become bound as a subscriber to the capital stock of a corporation must pay his subscription if required to meet the obligations of the corporation. A certificate in his favor for the stock is not necessary to make him a subscriber. All that need be done, so far as creditors are concerned, is that the subscriber shall have bound himself to become a contributor to the fund which the capital stock represents. If such an obligation exists, the courts can enforce the contribution when required. After having bound himself to contribute, he cannot be discharged from the obligation he has assumed until the contribution has actually been made, or the obligation in some lawful way extinguished."

In *Burke* v. *Smith*, 16 Wall. 390, 394, it was said, per Strong, J.: "It has been settled by very numerous decisions that the directors of a company are incompetent to release an original subscriber to its capital stock, or to make any arrangement with him by which the company, its creditors or the State shall lose the benefit of his subscription. Every such arrangement is regarded in equity not merely as *ultra vires*, but as a fraud upon other stockholders, upon the public, and upon the creditors of the company."

In *Upton* v. *Tribilcock*, 91 U. S. 45, it was held that "the original holder of stock in a corporation is liable for unpaid instalments of stock without an express promise to pay them; and a contract between a corporation, or its agents and him, limiting his liability therefor, is void both as to the creditors of the company and its assignee in bankruptcy."

It requires no argument to show that if a company cannot, by agreement in any form, when in insolvent circumstances, release the obligation of a subscriber to its stock, much less can it attain the same end by declining to accept payment of his subscription; and it is equally obvious that, even if such refusal is made when the company is supposed to be prosperous, yet if the stockholder declines to acquiesce in such refusal, and persists in maintaining his position as a stockholder and director until insolvency has supervened, it is then too late for him to claim the benefit of the company's refusal.

We have thus far dealt with this aspect of the case as if the company had, in point of fact, refused to accept the defendant's subscription money and to recognize him as a stockholder. But an examination of the record shows that there was no such refusal by the company either before or after it became insolvent.

The defendant's witnesses, consisting of Shotwell, the treasurer, of William Bispham, a partner of the defendant, and of the defendant himself, testified that several times during the year 1879 and the early part of 1880 the defendant had offered to pay the amount of his subscription, which the treasurer refused to accept, and the treasurer testified that, in so refusing, he was acting under the instructions of the president. But the president, when called on behalf of the plaintiff, denied that he had ever refused to accept the defendant's subscription money or to give him his stock, and denied that he had ever instructed the treasurer to do so.

With the testimony in this condition, the counsel of both parties conceded of record that there was no question of fact to be submitted to the jury, and requested the court to give peremptory instructions to the jury, and the court accordingly directed the jury to find for the defendant.

As the plaintiff had clearly made out a *prima facie* case before the defendant went into his evidence, and as the defendant did not ask to go to the jury on the questions of fact, he might well be regarded as having abandoned his defence so far as that depended on the evidence adduced by himself, and as having taken the position that the plaintiff's evidence did not make out a case.

But, even if it should, for the sake of the argument, be conceded that the jury did find that the treasurer, in refusing to accept the money, obeyed instructions given him by the president, such action on the part of the president was not the action of the company, and did not bind the company or its creditors.

The president had no legal power or authority to deplete the coffers of the company, by instructing the treasurer to refuse to accept subscription money when tendered.

In *Bank of the United States* v. *Dunn*, 6 Pet. 51, it was

held that an agreement by the president and cashier that the endorser on a note shall not be liable on his endorsement, does not bind the bank; that it is not the duty of the cashier and president to make such contracts, nor have they the power to bind the bank, except in the discharge of their ordinary duties.

It is true that if the acts of the president are ratified by the corporation, or if the corporation permits a general course of conduct, or accepts the benefit of his act, they will be bound by it. But the general rule is that the president cannot act or contract for the corporation, except in the course of his usual duties.

And the rule is still stronger against the power of the president to bind the corporation by giving up its securities or releasing claims in its favor.

In the present instance, there is no evidence whatever of ratification by the directors of the alleged act of the president in reference to the defendant's obligation. It does not appear that they knew anything about it, and it is plain that the company received no benefit from it.

Upon the facts disclosed by the record, we are clearly of opinion that the court below erred in instructing the jury to find for the defendant and in entering judgment on the verdict.

The judgment is

*Reversed, with directions to grant a new trial, and for further proceedings in conformity with this opinion.*