CARL W. VOLNEY, appellant,

*v.*

LEWIS NIXON, respondent.

[Argued November 23d and 25th, 1904. Decided March 6th, 1905.]

A contract between two persons that, in exchange for their joint property, one of them shall procure from a corporation of this state an original issue of stock to an amount known by all parties to be in excess of the value of the property, and shall divide the stock thus procured with the other person, is illegal, and the courts of this state will not aid in its enforcement, even though the objectionable feature has been accomplished by the actual issue of the stock.

---

On appeal from a decree advised by Vice-Chancellor Bergen, whose opinion is reported in *67 N. J. Eq. 457.*

*Mr. Frank P. McDermott,* for the appellant.

*Mr. Foster M. Voorhees,* for the respondent.

The opinion of the court was delivered by

DIXON, J.

Prior to May 7th, 1897, the complainant had invented some processes for the manufacture of smokeless powder, and at that time was the owner of about ninety per cent. of the stock of the Volney Smokeless Powder Company, a corporation of this state, organized in 1896, with a nominal capital of $100,000. The capital stock had all been issued, but for what does not clearly appear. So far as is disclosed the company had no property, except one of the Volney patents, issued in 1887, and the value of that, patent may be conjectured from the facts that the complainant did not operate under it in 1897, and early in that year had applied for two other patents on the same subject, which were issued in the fall of 1897.

This being the situation, the complainant and defendant, on May 7th, 1897, entered into a written contract, as follows:

"Memorandum of agreement made this seventh day of May, 1897, between C. W. Volney, party of the first part, and Lewis Nixon, party of the second part:

"WHEREAS, The said C. W. Volney is the sole owner of at least 60 per cent. of the stock of the Volney Smokeless Powder Company, organized under the laws of New Jersey, it is therefore mutually agreed:

"1. That the party of the second part, if he secures a contract for about 200,000 lbs. of smokeless powder, such contract being conditional upon the successful trial of a sample lot of powder made under the Volney patents, shall supply $5,000.00 in cash for the purpose of manufacturing such sample lot of powder, the money to be supplied as required by the party of the first part. In consideration of the payment of this amount of $5,000.00 the said Volney agrees to convey to the said Lewis Nixon $12,500 of his stock in the company above mentioned; and it is further mutually agreed that, in order to supply further money necessary to erect a plant for the manufacture of powder, $45,000.00 worth of the stock in the company above mentioned will be sold to the said Lewis Nixon for $45,000.00, and that the said Volney will then assign to a new company, to be organized with a capital stock of one million dollars, all his titles and interests in the patents obtained by him during 1897, the conveyance to be made so that the stock of the present company can be taken by the new company on the payment of ten shares of the new for one of the present.

"C. W. VOLNEY,    [L. S.]
"*Party of the First Part.*
"LEWIS NIXON,    [L. S.]
"*Party of the Second Part.*"

It should be specially noticed, as a circumstance throwing light on the developments of this case, that although there is no indication that the stock of the Volney Smokeless Powder Company was worth even par, yet the parties to this agreement contemplated the formation of a new company which should issue ten shares of its stock for one share of the old.

Starting with this contract, the complainant's contention is that the parties thereupon engaged in a joint enterprise for the manufacture of smokeless powder by the processes for which the Volney patents of 1897 were granted; that in this enterprise he furnished his time and skill, and about $2,000 in cash, and the defendant furnished about $30,000; that with this money land was leased or purchased; several small buildings and necessary machinery were constructed, and some explosives were manufactured; that pending these operations negotiations were started and conducted by the defendant, on behalf of himself and the complainant, for the formation of a new corporation, which resulted, on April 6th, 1899, in organizing the International Smokeless Powder and Dynamite Company under the laws of this state, with a nominal capital of $10,000,000; that immediately after its organization the complainant assigned to the company his patents of 1897 and agreed to convey to it, without further consideration, all his future improvements and inventions upon the same subject-matter, and the defendant transferred to the company the land, buildings and machinery above mentioned, of which the title stood in his name, and that for the rights and property thus conveyed to the company the defendant received from the company seventy-nine thousand shares of fully-paid capital stock of the par value of $50 per share, and about $33,000 in cash, subject, however, to the defendant's agreement to apply twenty thousand of the shares "for the benefit of the subscribers to the preferred stock of the company."

On these claims the complainant insists that he is entitled to one-half of the defendant's net receipts from the company, by virtue of the understanding between them, in pursuance of which their transfers to the company were made.

Respecting the precise terms of this understanding the parties are in dispute. At least some of its leading features (the de-

fendant insists all of them) are stated in a letter written by the
defendant to the complainant on the day before the incorporation
of the new company, as follows:

"ELIZABETH, N. J., April 5th, 1899.

*"Dr. Carl W. Volney, Keyport, N. J.:*

"DEAR SIR—Referring to our conversation of to-day, I beg to confirm
what I have said, which is as follows: That in the organization of the
new powder company, the consideration to you for the assignment of all
the patents which you control will be one hundred thousand dollars
($100,000) par value of the shares of the International Smokeless Pow-
der Company. In addition to this, it is understood between ourselves that
I shall turn over to you fifty thousand dollars ($50,000) par value of the
stock obtained by me from this company and two thousand dollars
($2,000.00) in cash. Assignments will be assigned, transferred and set
over concurrently with the transfer of stock.

"Yours truly,

"LEWIS NIXON."

But it is contended by the complainant that his further under-
standing was that the entire capital stock of the new company
should be only $1,000,000; that for the transfers made to it
by the complainant and defendant not less than $350,000 of
the capital should be issued to the defendant as fully-paid
stock for property purchased; that of this the defendant should
set aside $50,000 for a certain influential person named by him
and for certain newspaper men, and should divide the residue
of the stock equally with the complainant, so that together they
would acquire nearly one-third of the entire capital. This under-
standing, the complainant says, was induced by the statements
of the defendant, and their expectations as to the division of
stock were based on the contract of May 7th, 1897, modified so
as to allow the defendant one-half instead of the smaller share
indicated by that contract for the money actually advanced by
him, and not until after the $2,000 of cash and the $150,000 of
stock mentioned in the letter had been delivered to the complain-
ant, did he learn what the entire capital of the company was, and
what the defendant had actually received.

Assuming the facts to be as the complainant insists, he is not
entitled to the aid of this court.

It must be remembered that under the laws of New Jersey the
stock of a corporation can be originally issued for property pur-

chased only to the amount of what is honestly deemed by the directors the value of the property. *Donald* v. *American Smelting Co., 62 N. J. Eq. (17 Dick.) 729.*

The evidence in this case satisfies us that the contract set up by the complainant was in violation of this statutory policy; that there was no honest judgment on the part of anybody that the property for which it was intended that the company should issue $350,000 of fully-paid stock was really worth that sum of money. After the contract of May 7th, 1897, the first operations in the joint enterprise began in the erection of some small buildings in Keyport, at a cost of about $1,700. In May, 1898, the erection of similar buildings at South River Junction was commenced, but these seem not to have been completed when the transfer to the new company took place. I find no reason to think that the entire tangible property (land, buildings and machinery) was worth over $5,000. At Keyport, during the year 1898 and the early part of 1899, some powder was manufactured, to be tested at Sandy Hook for the United States government, but no test made resulted satisfactorily to the United States officers. Although in the whole venture the parties seem to have expended about $32,000, no income was obtained and no business was established, nor was it demonstrated that the processes of manufacture invented and patented by the complainant had any substantial value, so that when, in March, 1899, these parties were discussing their prospects in view of the organization of the new company, the defendant said to the complainant that they could not get much money for their stock, and the outlook, so far as realizing money from the enterprise was concerned, was rather poor. To this statement the complainant did not object, and, as he puts it, they "felt bad" about the situation. From these circumstances the only rational inference as to the worth of the property which these parties were about to exchange for corporate stock, is that it had but little value in comparison with the sum represented by the stock to be issued therefor. No one, by the exercise of honest judgment, did or could appraise that property at $350,000.

Another fact, clinching this inference respecting the valuation of the property, is the provision in the bargain, as claimed by the complainant, that out of the $350,000 of stock to be issued for the exchange, stock amounting to $50,000 was to represent, not the value of the property, but the influence of some outside persons exerted for some undisclosed object.

We conclude that according to the complainant's contention his bargain with the defendant was that the latter should get from the International Smokeless Powder and Dynamite Company an original issue of its stock, having a face value of $350,000, at least, in exchange for property which nobody believed to be worth that sum in money, and should equally divide with the complainant whatever he thus obtained. The purpose of that bargain was plainly illegal.

It is the settled policy of the courts in this state not to aid in the enforcement of such contracts, having either an illegal or an immoral purpose, even although the objectionable feature has been accomplished, and there remains only the distribution of the proceeds among the contracting parties. *Van Doren* v. *Staats, 3 N. J. Law (2 Penn.) 887; Watson* v. *Murray, 23 N. J. Eq. (8 C. E. Gr.) 257; Gregory* ads. *Wilson, 36 N. J. Law (7 Vr.) 315; Wyckoff* v. *Weaver, 66 N. J. Law (37 Vr.) 648.*

On these grounds, the decree denying relief to the complainant and dismissing his bill should be affirmed.

*For affirmance*—THE CHIEF-JUSTICE, DIXON, FORT, GARRETSON, PITNEY, SWAYZE, BOGERT, VREDENBURGH, VROOM, GREEN, GRAY—11.

*For reversal*—GARRISON—1.