ENRIGHT v. HECKSCHER.

(Circuit Court of Appeals, Second Circuit. February 27, 1917.)

No. 143.

1. COURTS ⊜276—JURISDICTION OF FEDERAL COURT—RESIDENCE OF DEFENDANT—WAIVER OF OBJECTIONS.

The objection that defendant does not reside in the district in which the suit was brought is one which may be waived by defendant, and is waived by his general appearance and by procuring extensions of time to plead, with the agreement that the issue should be of a day certain.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 815.]

2. BANKRUPTCY ⊜250(1)—ASSESSMENT AGAINST STOCKHOLDERS—CONCLUSIVENESS—MATTERS CONCLUDED.

An order of the bankruptcy court, directing that an assessment be levied against stockholders who had not been paid the full value of their shares, is conclusive as to the necessity of the assessment and as to the rate, but is not conclusive, in an action against the stockholder, that the stock was not full-paid.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 235, 350.]

3. CORPORATIONS ⊜269(3)—ISSUANCE OF STOCK—VALUATION OF PROPERTY—FRAUD—EVIDENCE.

In an action by a trustee to collect the balance due on stock issued by the corporation to a director in exchange for mining leases, after it had agreed to sell the stock to others as full-paid at half its par value, evidence *held* to warrant the jury in finding fraud on the part of the directors in valuing the licenses, so that the stock was not full-paid, under Corporation Act (P. L. N. J. 1896, p. 293) § 49, permitting stock to be issued only for money or property, and providing that the valuation of the property by the directors shall be conclusive, in the absence of fraud.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 887, 888, 1154–1159, 2277.]

4. CORPORATIONS ⊜99(2)—ISSUANCE OF STOCK—VALUATION OF PROPERTY—STATE STATUTE.

Under Corporation Act N. J. § 49, authorizing a corporation to issue stock for property which shall be full-paid, and that, in the absence of actual fraud, the judgment of the directors as to the value of the property shall be conclusive, stock can be originally issued for property purchased only to the amount of what is honestly deemed by the directors to be the value of the property.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 445.]

5. CORPORATIONS ⊜99(2)—ISSUANCE OF STOCK—FRAUD—VALUATION OF PROPERTY—EFFECT.

A contract for the issuance of full-paid corporate stock in exchange for property fraudulently overvalued by the directors, contrary to Corporation Act N. J. § 49, is void, not merely voidable, and no proceedings are necessary to procure an adjudication of its nullity.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 445.]

6. CORPORATIONS ⊜298(5)—DIRECTORS—INTEREST—QUORUM.

A director, whose interest in a matter disqualifies him from voting upon a resolution relating thereto, cannot be counted for the purpose of ascertaining whether a quorum is present when the vote is taken, since a director so disqualified loses, pro hac vice, his character as a director.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1302–1312.]

⊜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

7. CORPORATIONS ☞243(1) — STOCKHOLDERS — LIABILITY — ACCEPTANCE OF STOCK.

One who accepts stock issued to him by a corporation at less than par is liable to a receiver for the benefit of creditors, though the resolution authorizing the issuance was void, because no quorum was present.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 943, 946, 957–959, 979.]

8.. CORPORATIONS ☞298(5)—REPRESENTATION BY DIRECTORS—INTERESTED DIRECTOR.

A resolution adopted by the directors of a corporation, fixing the value of property for which stock was issued was a nullity, where no quorum was present, because one of the directors counted in the quorum was adversely interested in the issuance of the stock.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1302–1312.]

9. CORPORATIONS ☞99(2)—ISSUANCE OF STOCK—VALUATION OF PROPERTY—STATUTE.

Corporation Act N. J. § 49, providing that the judgment of the directors of a corporation as to the value of property for which stock is issued shall be conclusive, in the absence of fraud, contemplates an actual appraisement of the property by the board of directors, where stock is to be issued for the property.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 445.]

10. CORPORATIONS ☞232(3)—ISSUANCE OF STOCK—FICTITIOUS VALUE OF PROPERTY—CREDIT FOR REAL VALUE.

A stockholder, to whom stock was issued as full-paid for property fraudulently overvalued by the directors, is entitled to credit for the fair value of the property, in an action by the corporation's trustee in bankruptcy to enforce his liability on the stock.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 884.]

11. CORPORATIONS ☞232(3)—ISSUANCE OF STOCK—RETURN TO TREASURY—SUBSEQUENT SALE.

Where stock, which had been issued to a director as full-paid in exchange for mining leases, which were fraudulently overvalued, was returned by the director to the corporation as treasury stock, it did not thereby become full-paid, and a purchaser at less than par value, who had knowledge of the facts, is liable for the balance due on the stock.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 884.]

12. CORPORATIONS ☞230—ISSUANCE OF STOCK—TREASURY STOCK.

Where corporate stock has been lawfully issued as full-paid stock, and then returned to the corporation as treasury stock, the corporation may sell it at any price it can obtain, and the purchaser is not liable for the par value of the stock.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 877.]

13. CORPORATIONS ☞244(5, 7)—ISSUANCE OF STOCK—LIABILITY OF PURCHASER—NOTICE.

Where stock is issued as full-paid on part payment only, a transferee with notice is liable on the stock to the same extent as the transferror, but in the hands of a purchaser without notice the stock is regarded as full-paid.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 967, 972, 973.]

14. CORPORATIONS ☞244(5)—ISSUANCE OF STOCK—KNOWLEDGE BY STOCKHOLDER—AGENCY.

Where two directors of a corporation agreed each to take one-half of a new issue of the corporate stock at less than par value, and the offer to the corporation to purchase the stock was made in the name of one of them, but the earnest money was advanced by both, and the broker's

commission on the sale shared by both, the subscribing director was the agent of the other, so that the former's knowledge of the facts which prevented the stock from being full-paid was chargeable to the latter.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 967.]

15. CORPORATIONS ⚭247—LIABILITY OF STOCKHOLDER—RELEASE BY CORPORATION.

A stockholder's liability for the balance of the par value of stock issued as full-paid cannot be released by the directors over the objection of one stockholder, or as against the creditors.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 983–997.]

16. CORPORATIONS ⚭99(3)—ISSUANCE OF STOCK—MARKET PRICE—STATUTE.

The rule that a going corporation, whose stock has a market value, may sell subsequent stock issues, made for the purpose of paying its debts or obtaining new capital, at the market value of the outstanding stock, does not apply to a New Jersey corporation, since it is contrary to the statute of that state; Corporation Act (P. L. N. J. 1896, p. 284) § 21, providing that, where the whole capital of a corporation shall not have been paid in, and the capital paid shall be insufficient to satisfy its debts and obligations, each stockholder shall be bound to pay on each share held by him the amount of such share as fixed by the charter of the corporation, or such proportion of that sum as shall be required to satisfy the debts.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 446.]

17. CORPORATIONS ⚭232(1)—LIABILITY OF STOCKHOLDERS—INTEREST.

Where a stockholder receives stock from a corporation as full-paid, for which he gave less than par, he is liable for interest, as damages for the retention of the money, on the balance of the par value of the stock from the time payment for the stock is due.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 879, 880, 987.]

In Error to the District Court of the United States for the Southern District of New York.

Action by John M. Enright, as trustee in bankruptcy of the Newfoundland Syndicate, a corporation, against August Heckscher. Judgment for plaintiff for part only of the amount sued for, and both parties bring error. Affirmed.

This cause comes here on cross-writs of error to the United States District Court for the Southern District of New York on a judgment for $105,979.35. The plaintiff is a citizen of the state of New Jersey. The defendant is a citizen of the state of New York, and resides in the Southern district of New York. The Newfoundland Syndicate is a corporation incorporated in 1904 under the laws of the state of New Jersey. It will be hereinafter referred to as the Syndicate. The objects for which the Syndicate was formed were, inter alia, to purchase, acquire, or lease mines or mineral lands of every kind, nature, and description, to work, prospect, explore, and develop mines and mineral lands, and to engage in and operate in mining of all kinds.

Nelson S. Spencer and Elbridge L. Adams, both of New York City, for plaintiff.

Parks, McKinstry & Taft, of New York City (Justice Sheffield, of New York City, of counsel), for defendant.

Before COXE, WARD, and ROGERS, Circuit Judges.

⚭For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
240 F.—55

ROGERS, Circuit Judge (after stating the facts as above). This action is brought by the trustee in bankruptcy of the Syndicate to recover $250,000 upon an assessment made by the bankruptcy court upon unpaid stock of the bankrupt held by the defendant, and which it is claimed was acquired by him with knowledge that it was not full-paid.

On December 29, 1911, the trustee in bankruptcy of the Syndicate instituted proceedings in the bankruptcy court of the district of New Jersey, to assess any stock of the bankrupt corporation which had been issued for less than its par value. An order to show cause why the trustee should not be directed to levy such an assessment was served upon the defendant by mail. He appeared specially and objected to the jurisdiction of the court. The referee considered the objection well taken and dismissed the petition, but his action was reversed in the District Court. In re Newfoundland Syndicate (D. C.) 196 Fed. 443 (1912). Thereupon the defendant appealed, and the United States Circuit Court of Appeals for the Third Circuit affirmed the court below. 201 Fed. 917, 120 C. C. A. 255 (1913). The referee was directed to determine whether an assessment was necessary and if found to be necessary to determine the rate thereof, and to levy the same upon whatever stock may appear prima facie to be subject to assessment.

Thereupon the referee in bankruptcy in the district of New Jersey on April 12, 1915, determined that the debts of the bankrupt amounted to $1,096,027.89 and the assets (not counting liabilities on unpaid stock) amounted to $2,500, and that it was necessary to assess the unpaid stock, and directed as follows:

"That an assessment be and the same hereby is made and levied upon 5,000 shares of the capital stock of the Newfoundland Syndicate issued to J. M. Ceballos & Co., on the 8th of November, 1905, and upon 5,000 shares of the capital stock of the Newfoundland issued to August Heckscher on the 9th of November, 1905, at the rate of 50 per cent. of the par value thereof, of $100 a share, together with interest thereon from November 1905."

The trustee made a call upon Heckscher for the payment of the assessment of $250,000, with interest from November 8, 1905, and, the same not having been paid, brought this action to recover the amount of the assessment.

It appears that the Syndicate was originally organized with an authorized capital stock of $300,000. By an amendment of its charter, in July, 1905, this was increased to $2,000,000. At some time in October, 1905, it found itself in need of additional capital. An attempt was made to interest the banking firm of J. M. Ceballos & Co. in the matter, and interviews with its officers were had. On October 26, 1905, Ceballos & Co. sent to the Syndicate a letter which reads as follows:

"Confirming our several interviews with the officers of your company, we hereby ratify our agreement to take over $1,000,000 of the full-paid and non-assessable capital stock of your company, to provide for which an increase of $1,000,000 in the capital stock is to be duly authorized by the stockholders, that is to say, from $2,000,000, its present amount, to $3,000,000, and to pay

for said $1,000,000 stock the sum of $500,000, we in addition to receive a banker's commission of $100,000 stock of the Newfoundland Syndicate."

The same day this letter was written the directors of the Syndicate met, and the letter was read and its terms accepted. It was voted to call the necessary meeting of the board of directors and the stockholders to authorize the increase of the capital stock as proposed. The meeting was held at the office of the company in Jersey City on November 2, 1905, and the necessary vote was had. A certificate amending the certificate of incorporation and increasing the stock from $2,000,000 to $3,000,000 was executed and filed at Trenton, in the office of the secretary of state of New Jersey. The increase in the capital stock having been authorized, the directors voted to issue it, and also to purchase certain mineral licenses and locations from George P. Mumford, one of their number, which they valued at $1,000,000 and which they agreed to pay for in the new stock, which was to be issued to Mumford as full-paid and nonassessable. This having been agreed upon, Mumford offered to turn back the stock into the treasury and, his offer having been accepted, this was done. Thereupon the directors sold the $1,000,000 of stock to Ceballos & Co., as full-paid and nonassessable stock, for $500,000; and Ceballos & Co. at once turned over to defendant Heckscher one-half of the stock for $250,000, and the claim is that, as Heckscher only paid $250,000 for stock of the par value of $500,000, he is liable to the trustee in bankruptcy of the Syndicate for the balance of $250,000 due on the stock. The case was submitted to a jury, which returned a verdict in favor of the trustee for the sum of $105,000. A new trial was denied and judgment has been entered for the plaintiff. Both parties have taken out writs of error to review the proceedings.

[1] The defendant has raised the objection that the action has been brought in the wrong district. The complaint alleges that defendant resides in the Southern district of New York. On June 17, 1915, the defendant by his attorneys entered a general appearance and obtained a general extension of time to plead, on a condition inserted in a written stipulation that the date of issue was to be as of June 24, 1915. On September 13, 1915, an order was issued to show cause why the defendant should not have leave to withdraw the general notice of appearance and substitute a special appearance for the purpose of moving to set aside the service of the summons and complaint, on the ground that the defendant is not a resident of the Southern district of New York and that the action is not brought in the district of which either the plaintiff or defendant is a resident; the latter claiming to be a resident of the Eastern district of New York. On September 16, 1915, the District Judge denied the motion to set aside the service, and his action in this respect has been assigned for error. The right to be sued in a special district is a personal privilege, which may be waived, and is waived by a general appearance and by procuring extensions of time to plead, with the agreement that the issue should be of a day certain. It is very evident that the plaintiff consented thereby to accept the jurisdiction of the District Court for the Southern District of New York. See In re Moore, 209 U. S. 490, 28 Sup.

Ct. 706, 52 L. Ed. 904, 14 Ann. Cas. 1164; Interior Construction & Improvement Co. v. Gibney, 160 U. S. 217, 16 Sup. Ct. 272, 40 L. Ed. 401. We may add, however, that it is not clear to us that defendant was sued in the wrong district, as it appears that he has maintained a residence for the past ten years at 576 Fifth avenue, New York City, and that the Syndicate's stock ledger so gives his residence, and that notices of assessment have been sent to him there.

[2] The action of the bankruptcy court is conclusive, so far as the necessity of an assessment against any unpaid stock that may exist is concerned, and also as to the rate of the assessment. In this case the amount of stock assessed, if the whole amount of the assessment were to be collected, would not be sufficient to pay in full the unsecured creditors of the Syndicate. Beyond these facts the defendant was not concluded by the action of the bankruptcy court. He was entitled, in the action brought by the trustee in bankruptcy to collect this assessment, to show that the stock upon which he has been assessed was not assessable because it was fully paid up when he acquired it, or if it were not that that fact was not known to him when he purchased it, or any other defense which he may have upon the merits.

The Corporation Act of New Jersey (Revision of 1896) applicable to the transactions now under consideration, provides in section 21 that where the whole capital stock has not been paid in and the capital paid shall be insufficient to satisfy its debts and obligations, each stockholder shall be bound to pay on each share held by him the sum necessary to complete the amount of such share as fixed by the charter of the corporation or such proportion of that sum as shall be required to satisfy such debt or obligation.

It is also provided in section 48 that nothing but money shall be considered as payment of any part of the capital stock of any corporation organized under the act except in the case of the purchase of property.

And section 49 of the act reads as follows:

"Any corporation formed under this act may purchase mines, manufactories or other property necessary for its business, or the stock of any company or companies owning, mining, manufacturing or producing materials, or other property necessary for its business, and issue stock to the amount of the value thereof in payment therefor, and the stock so issued shall be full-paid stock and not liable to any further call, neither shall the holder thereof be liable for any further payment under any of the provisions of this act; and in the absence of actual fraud in the transaction, the judgment of the directors as to the value of the property purchased shall be conclusive; and in all statements and reports of the corporation to be published or filed this stock shall not be stated or reported as being issued for cash paid to the corporation, but shall be reported in this respect according to the fact." P. L. 1896, p. 293.

It is said that the stock now held by Heckscher was full-paid and nonassessable at the time it was delivered to Ceballos & Co., and through that firm to defendant, because of the prior sale of the stock to Mumford for his mining licenses, valued, as we have seen, by the directors at $1,000,000. It is necessary, therefore, to consider that transaction more in detail. It appears that on the same day that the

increase of the capital stock was authorized the board of directors met, with five directors out of nine present. A by-law of the company required a majority of the whole board to be present to constitute a quorum to transact business. One of the five directors present was George D. Mumford. At this meeting a resolution was introduced to purchase from Mumford the mineral licenses and locations and to give him therefor $1,000,000, to be paid to him in full-paid and nonassessable stock of the company—10,000 shares, of the par value of $100 each. These licenses gave to Mumford the right to the minerals in the locations specified for one year, with the privilege of obtaining a lease for 99 years. They were obtained at various times between April 14, 1905, and September 22, 1905. The right expired at the end of the year. He paid for them at the rate of $10 a location, which is a fixed fee for which any one can get a license. There were 88 licenses, for which he paid $880. At the time he gave his testimony he was not sure whether he had not been reimbursed by the Syndicate for his expenditures in procuring them, and would not swear that he had not been paid for all of them. The books, however, showed that on September 25, 1905, he was paid $941.75 for disbursements, and he was unable to state what the disbursements were for.

While the resolution as to the purchase of the licenses was under consideration, Mumford retired from the room in which the directors were meeting and did not participate in the action taken. It was adopted, therefore, at a meeting at which a quorum was not present. A resolution was also adopted at the same time and by the same vote, adjudging that the licenses and locations were of the par value of $1,000,000. This action having been taken and made known to Mumford, he immediately assigned the licenses and locations to the Syndicate, and offered to return the stock into the treasury of the Syndicate, to be sold by it for the purpose of raising additional working capital. Thereupon it was voted, no quorum being present, to accept Mumford's offer. The evident purpose of this proceeding was to make the stock full-paid and nonassessable. The fact that no quorum was present when the stock was issued to Mumford does not in itself invalidate the transaction, as will more fully appear hereafter. But the question remains whether the transaction with Mumford was invalid, in so far as it was agreed that the licenses were worth $1,000,000 and that the stock should be regarded as full-paid and nonassessable.

[3] The Corporation Act of New Jersey only permits stock to be issued to the value of the property purchased. The District Judge submitted it as a question of fact for the jury whether the directors overvalued the licenses and issued stock to Mumford in excess of the true value of the property received; and the jury were informed that under the New Jersey statute the judgment of the directors as to the value of the property purchased was conclusive, in the absence of actual fraud. The verdict of the jury establishes the fact that the stock was issued in excess of the value of the licenses, and it also establishes the actual fraud. There was evidence to justify the verdict. In fact, we do not see how the jury could have reached a different conclusion. It is incredible that the licenses were worth $1,000,000,

for it is incredible that Mumford would have given this stock back to the company, and so lost the licenses and the stock in addition, if the licenses had been worth $1,000,000. He would have been giving the company $1,500,000, for he knew that Ceballos & Co. had offered in writing to buy the stock from the Syndicate for $500,000 and that the offer had been accepted. The offer was to take the $1,000,000 of stock, "full-paid and nonassessable," for $500,000. Mumford knew that on the day the offer was made the directors had voted to accept it. He knew that on the next day Ceballos & Co. turned over a check for $50,000 to the Syndicate, to be applied on account of the purchase price of the stock, and it was so applied. He knew that the resolution accepting Ceballos & Co.'s offer was never rescinded, and the $50,000 received in part payment was at no time returned. As the stock was already sold to Ceballos & Co. and in part paid for, it certainly was a most unusual proceeding for the directors to sell the same stock on November 6, 1905, to Mumford in payment for the licenses, and then for Mumford at the same meeting to offer to return the stock gratuitously into the treasury of the company; and then, the offer having been at once accepted by resolution of the directors and with no mention of thanks for Mumford's altruistic conduct, it was immediately voted that the officers of the Syndicate "be and are hereby authorized to deliver to Messrs. J. N. Ceballos & Co. the 10,000 shares of stock of this company so held in its treasury, under and pursuant to the terms of the agreement heretofore entered into between this company and Messrs. J. N. Ceballos & Co., dated October 26, 1905"; and on November 8, 1905, "pursuant to the terms of the agreement" of October 26, 1905, the stock was delivered to Ceballos & Co. as "full-paid and nonassessable." The whole purpose of the transaction with Mumford clearly was to make the stock "full-paid and nonassessable," so as to meet the conditions of the offer to give $500,000 for $1,000,000 of stock, which was to be "full-paid and nonassessable." It is impossible to believe that the directors were acting in good faith when they sold to Mumford stock which they had already sold and fully expected to deliver to Ceballos & Co., and which they subsequently did deliver.

There is no necessity for inferences, for Mumford's own testimony makes the matter perfectly clear. He testified that he knew at the time of the negotiations with Ceballos & Co. which led that firm to make its offer, and that he was uncertain whether he had not himself initiated the negotiations. He admitted that he discussed the matter with Mr. Ceballos and with Mr. Fiske, a member of the firm of Ceballos & Co. prior to the offer of Ceballos & Co. to take the stock. He is a lawyer, and was a director and member of the executive committee of the Syndicate, and its legal adviser at the time. He testified that it was necessary to increase the capital stock, and that the whole matter of how the thing was to be accomplished "so as to comply with the law" was left to him as counsel of the Syndicate. He says he discussed with the president of the company the fact that he was willing to turn over the licenses that were in his name as a basis for the issuance of the $1,000,000 of stock, and that he informed the presi-

dent that in view of the situation that he would be willing, after he got the stock, to turn it back into the treasury of the company "in order that it [the Syndicate] could turn it over to Ceballos & Co. for $500,000." He also testified that it was agreed that the stock would be immediately turned back by him to the treasury. All this was agreed upon before the increase of the stock was voted.

It is evident that the sole purpose of the transaction with Mumford was to make the stock full-paid and nonassessable.

[4] The courts of New Jersey hold that under the laws of that state stock can be originally issued for property purchased only to the amount of what is honestly deemed by the directors the value of the property. See Donald v. American Smelting Co., 62 N. J. Eq. 729, 48 Atl. 771, 1116; Volney v. Nixon, 68 N. J. Eq. 605, 60 Atl. 189. In the first of these cases Mr. Justice Dixon said:

"Their [directors'] honest judgment, if reached without due examination into the elements of value, or if based in part upon an estimate of matters which really are not property, * * * may lead to a violation of this statutory rule as surely as would corrupt motive."

And see Holcombe v. Trenton White City Co., 80 N. J. Eq. 122, 144, 82 Atl. 618 (1912).

It does not appear in this record that the directors made any examination into the value of these licenses. In Honeyman v. Haughey (N. J. Ch.) 66 Atl. 582 (1906), stock was issued as fully paid stock to stockholders in exchange for a patent upon which a valuation of $1,000,000 was placed. The stock was then turned back to the treasury. The vice chancellor in commenting on the transaction remarked that:

"If a proceeding of this kind can be sanctioned by the court, it would be a very simple matter for all stockholders to avoid payment for capital stock issued to them."

The remark appears as applicable to the case now before us as it was to the case in which it was made. In that case the vice chancellor had no difficulty in arriving at the conclusion that the transaction was fraudulent and that it was a perfectly clear case of overissue of stock for property at a gross overvaluation.

In Easton National Bank v. American Brick & Tile Co., 70 N. J. Eq. 722, 730, 64 Atl. 1095 (1906), an attempt was made to show that the stock was issued in exchange for certain patent rights and processes, and that the directors after careful consideration had determined that the patents were worth at least the sum of $802,400, and that the directors authorized the issue of 8,024 shares in payment therefor, together with a cash payment of $20,000. In regard to this transaction the New Jersey Court of Errors and Appeals, unanimously affirming the opinion of the vice chancellor in the court below, said:

"We also agree with the view of the vice chancellor that, if we were to accept the claim of the appellants that the directors did determine to issue all the stock in question for the patents, it would result that the proceeding must be considered a mere device on the part of the directors to evade the letter and spirit of the Corporation Act, to accomplish which the patents were intentionally overvalued."

And in the same case the Court of Errors and Appeals, referring to the New Jersey Corporation Act, declares that:

"The whole spirit and policy of the act are so clearly opposed to any arrangement by which corporate stock shall be issued without receipt by the company of an equivalent in value to its par that any agreement to this effect must be deemed void as contrary to the policy of the law. If any doubt has existed upon this question, it must be taken as settled by the decision of this court in Volney v. Nixon, 68 N. J. Eq. 605 [60 Atl. 189], 70 N. J. Eq. 740, 64 Atl. 920, 8 L. R. A. (N. S.) 271, 10 Ann. Cas. 84."

[5] Moreover, under the New Jersey decisions, if the contract contravenes the Corporation Act, it is not voidable, but void, and no proceedings are necessary to procure an adjudication of its nullity. Easton National Bank v. American' Brick & Tile Co., supra; Holcombe v. Trenton White City Co., supra. It therefore follows that the agreement that the stock purchased by Mumford should be regarded as full-paid was void, and affords no obstacle to the relief asked in this suit.

The theory upon which the case was submitted was that, in case the jury found that the value of the licenses was less than $1,000,000, they should place a value upon them as of the time when the Syndicate took them over, and that the difference between such value and $1,000,000 would represent the extent to which the $1,000,000 stock issue was unpaid when it was turned back into the treasury; that one-half of that difference would be the amount Heckscher would have to pay for the one-half of the 10,000 shares he took, and that on that amount he should be credited with $250,000 in cash, which it was conceded he had paid, and that on the balance he should pay interest from November 8, 1905, that being the date when he acquired his stock.

In his charge to the jury the learned District Judge, in referring to the action of the directors in taking over the licenses for $1,000,000 of stock, informed them that:

"It seems from the minutes that there were five directors present, but that Mr. Mumford was interested in this transaction, and left the room or retired while the directors were considering this proposition, and took action upon this proposition, and was not present when it was acted upon. Of course, it would constitute a quorum if he was there, even though he had not voted; but if he left the room, so as to leave only 4 directors present, and 9 were required, it seems equally clear that there would have been no directors' meeting at the time this action was taken, and therefore there would have been no finding by the directors, as required by section 49 of the Corporations Law, that the value of the property transferred was equal to the value of the stock issued."

[6] A director, whose interest in a matter disqualifies him from voting upon a resolution concerning it, cannot, according to the better opinion, be counted for the purpose of ascertaining whether a quorum is present when the vote is taken. A director so disqualified by personal interest loses, pro hac vice, his character as a director, and so cannot be counted. That is the law of New Jersey. Metropolitan Telephone & Telegraph Co. v. Domestic Telegraph & .Telephone Co., 43 N. J. Eq. 626, 14 Atl. 908; Id., 44 N. J. Eq. 568, 14 Atl. 907. And it is supported by the weight of authority in other jurisdictions as well. Bassett v. Fairchild, 132 Cal. 637, 64 Pac. 1082, 52 L. R. A. 611; Curtin v. Salmon River Hydraulic Gold Mining & Ditch Co., 130 Cal.

345, 62 Pac. 552, 80 Am. St. Rep. 132; Smith v. Los Angeles Im-. migration, etc., Ass'n, 78 Cal. 289, 20 Pac. 677, 12 Am. St. Rep. 53; Hill v. Rich Hill Coal Mining Co., 119 Mo. 9, 24 S. W. 223; Star Mills v. Bailey, 140 Ky. 194, 130 S. W. 1077, 140 Am. St. Rep. 370; 7 R. C. L. 446. But see Gumaer v. Cripple Creek Tunnel, etc., Co., 40 Colo. 1, 90 Pac. 81, 122 Am. St. Rep. 1024, 13 Ann. Cas. 781; Buell v. Buckingham, 16 Iowa, 284, 85 Am. Dec. 516.

[7] So far as the issue of the stock to Mumford and the subsequent issue of it to Ceballos & Co. is concerned, it is not important whether a quorum was present or not. The stock was issued, and Mumford accepted it, and so did Ceballos & Co. The acceptance of stock renders the holders liable to a receiver for the benefit of creditors. That is the law of New Jersey as it is of other jurisdictions. Holcombe v. Trenton White City Co., supra. And in See v. Heppenheimer, 69 N. J. Eq. 36, 77, 61 Atl. 843 (1905), it is declared that one who receives stock as full-paid without paying for it, occupies the position of a subscriber to stock who has not paid his subscription.

[8] But the resolution finding that the licenses were worth $1,000,-000 was a nullity, as there was no quorum present when it was adopted. The charge of the District Judge on that matter was correct.

[9] The New Jersey statute contemplates that, where stock is issued for property, an actual appraisement of the property should be made by the board of directors. Holcombe v. Trenton White City Co., supra. In this case no such appraisement was ever made.

[10] But the charge that there might be credited on the stock the value of the mineral licenses at the time the stock was purchased by Mumford is correct; for, while the agreement that the stock should be regarded as full-paid was a nullity, yet the holders are entitled to have the fair value of the licenses credited on the stock. In Holcombe v. Trenton White City Co., supra, the vice chancellor held that though an issue of corporate stock for property purchased and at a grossly excessive valuation is a nullity, the stockholders are nevertheless entitled to have credited to the payment of stock the just and fair value of the property conveyed to and services rendered for the company and for which stock was issued. See, also, See v. Heppenheimer, supra; Easton National Bank v. American Brick & Tile Co., supra. This we understand to be the rule generally. Pell's Case, L. R. 8 Eq. 222.

[11] This brings us to inquire what the effect was of turning this stock back into the treasury of the Syndicate. Did it make the stock full-paid and nonassessable, so that it could be sold to Ceballos & Co. for what it would bring in the market? When Mumford acquired this stock for the licenses, if the property transferred for the stock was not worth the nominal value of the stock then Mumford under the New Jersey decisions was liable to the corporation for the difference between the value of the property and the nominal value of the stock. In his hands it was not full-paid and nonassessable; and if then he had sold the stock to Ceballos & Co., who took with full knowledge of the transaction, there can be no doubt that Ceballos & Co. would themselves have become liable to pay the balance due on the stock.

And if the transaction between Mumford and the Syndicate had not occurred, and Ceballos & Co. had bought directly from the Syndicate and paid 50 cents on the dollar for the stock, there can be no doubt under the New Jersey act that Ceballos & Co. would have been liable to make good the difference between the par value and the amount they paid. .

It is claimed, however, that because Mumford turned back the stock into the treasury of the company it became converted thereby into "treasury stock," and as such could be sold "as full-paid and non-assessable" to Ceballos & Co. or anybody else for whatever it would bring, even though the purchaser knew all the facts connected with the original sale to Mumford. If that be true, then we are obliged to hold that a transaction which on its face was a sham and intended as an evasion of the statute was effective, and enabled the corporation to sell its stock for less than par, in direct violation of the Corporation Law under which it was organized and derived its powers. We do not believe that such is the law, or that courts can permit a corporation thus to collude with one of its directors to evade and circumvent the positive prohibition of the statute.

[12] When stock is issued by a corporation for property, a part of it is sometimes returned to the corporation as treasury stock, to be disposed of for the purpose of selling it to raise money to carry on its operations. Stock so turned in is known as treasury stock, and the cases hold that a corporation may sell such stock at the best price that can be obtained for it and the purchasers are not liable beyond the agreed price even to creditors. That this is the law we concede, and no citation of authorities is necessary. But this principle assumes that the stock has once been legally issued as full-paid stock. If the stock has never been legally issued as full-paid stock, the principle can have no application. A dishonest and fraudulent sale of the stock, made for the very purpose of defeating the statute violating the positive prohibitions of it, is a nullity. If the Syndicate had issued this stock to Mumford as a gratuity, and he had subsequently returned it into the treasury, would any one contend that it could be sold as treasury stock for less than par? We can see no difference between such a case and the case at bar. If such a transaction can be upheld the prohibition of the statute seems to us to be of no account. In Cook on Corporations, vol. 1, § 46, p. 196, that writer, in speaking of treasury stock, says:

"Such stock having once been *legally* issued as full-paid stock, and then donated back into the corporate treasury, can be legally sold for cash at less than par."

With that proposition we have no quarrel. What we hold is that, where such stock has been illegally issued as full-paid stock and then donated back into the corporate treasury it cannot under the New Jersey Corporation Act be legally sold for less than par. The rule is correctly stated in Marshall on Corporations, page 561:

"It is too clear to admit of question that, when stock has been once issued and fully paid for, there is nothing to prevent the stockholders from returning the whole or part thereof to the corporation, or to a trustee for its use, to be

disposed of for its benefit, and in such a case the corporation or trustee may dispose of the stock at less than its par value without violating statutory or constitutional provisions regulating the issue of stock, and without rendering purchasers thereof liable to creditors beyond the price which they agree to pay. This exception to the general doctrine does not apply, however, where the transaction under which the corporation reacquires the shares is not in good faith, but a mere device on the part of the stockholders to avoid payment in full. Stockholders cannot escape liability to creditors by subscribing for stock, and then surrendering it to the corporation before payment therefor, and afterwards taking the same from the corporation, controlled by them, at a reduced value."

[13] This makes it necessary to inquire whether Heckscher acquired this stock with full knowledge of the circumstances under which it was issued; for the law is clearly established that where stock is issued as full-paid on payment of a part only, and the person to whom it is issued transfers the same to a purchaser with notice, the transferee stands in the transferror's shoes, and will be liable on the stock to the same extent as the transferror. But, if the transfer is to a purchaser without notice, no such liability attaches, and the stock is regarded as full-paid. The judge charged the jury on this subject as follows:

"So, if the stock were not fully paid according to the laws of New Jersey, it would make no difference, as I see it, whether Mr. Hecksher, when he bought the shares, had knowledge of that fact or not, and for this reason: Probably, if he bought it on the stock market or from a purchaser other than the company itself, the rule might be different, if he also purchased in good faith and for value, without notice that the company had not received full value for the stock; in that event he might have been a bona fide transferee, and could not be subjected, under the New Jersey law, for the unpaid stock subscription, if there was any. In this case, however, it is without dispute that he bought this stock either from Ceballos & Co. directly or jointly with Ceballos & Co., who purchased the stock from the company. In either case he knew the stock was being purchased from the company, and that the company had only received 50 cents on the dollar from the par value of the stock, when he made the purchase, and therefore, as I see it, he would not be a purchaser in the open market in the ordinary course of business, and under such circumstances as that he would be charged with knowing that the company did not get full value, if that was a fact, since he was only paying to it, or knew that Ceballos was only paying to it, 50 cents on the dollar, instead of the 100 cents on the dollar. If it was not fully paid up under those circumstances, he would become responsible; and if he did not actually know it to be a fact, it would not exonerate him from liability."

This part of the charge was duly excepted to. The plaintiff's expert on the law of New Jersey testified as follows:

"I think, where there is a transfer of shares which have not been fully paid for, that the transferee is liable for the balance of his shares, unless he can show that he has acquired those shares in the ordinary course of business, for full value, and without notice of the fact that there was an unpaid amount, or illegality about the issue of the shares."

[14] The circumstances of Heckscher's purchase of this stock are as follows: Heckscher and Fiske were members of the board of directors of the Syndicate, and aware of the fact that the company needed to increase its capital, and proposed to do so to the amount of $1,000,000. Fiske conferred with Heckscher as to the advisability of their purchasing the stock it was proposed to issue, and Fiske told

him that his firm of Ceballos & Co. would supply half the money needed to purchase it if he (Heckscher) would furnish the other half, the stock to be bought for 50 cents on the dollar. Heckscher testified that he agreed to furnish half the money. He also testified that on October 26, 1905, 11 days before the company was authorized to issue the stock, he sent Ceballos & Co. his check for $25,000 for his half of a payment on account of the stock, and on that day Ceballos & Co. sent to the Syndicate the letter, which appears in an earlier part of this opinion, making an offer for the stock. On the same day the directors met and accepted the offer contained in the above letter. And on October 27, 1905, Ceballos & Co. sent their check for $50,000 to the Syndicate, to be applied on the purchase, and the Syndicate acknowledged the receipt of the check to Ceballos & Co., in which it stated:

"It is understood that this payment is to be applied on account of purchase of $500,000 to be paid by you for $1,000,000 of Syndicate stock under the terms of your offer of October 26, 1905, accepted by the board of directors upon that date."

Then at the meeting on November 2, 1915, after the deal with Mumford already stated had been consummated, the stock, having a par value of $1,000,000, was authorized to be issued to Ceballos & Co. for $500,000. The certificates were issued to Ceballos & Co. on November 8, 1905, and one-half of the certificates were at once surrendered to Heckscher. It is evident that Ceballos & Co. were acting for themselves and Heckscher in making this purchase. And in law Heckscher, if he did not otherwise have knowledge of the facts, would be charged with notice of the facts known to Ceballos & Co., his agent in the transaction, that they were purchasing from the company $1,000,000 of stock for $500,000.

There is another circumstance in this connection which also shows what the relation was between Heckscher and Ceballos & Co. in the purchase of this stock. The offer to the Syndicate was not simply to pay $500,000 for $1,000,000 in stock, but the purchasers were in addition to receive a banker's commission of $100,000 of the original stock. This was turned over to Ceballos & Co. and the latter transferred one-half of it to defendant Heckscher. This $100,000 of stock would not have been divided with Heckscher, unless the purchase of the new stock had been a joint transaction. This stock was obtained by the Syndicate from the stockholders by a voluntary contribution of 5 per cent. of their respective stockholdings on the basis of the capitalization of $2,000,000. If Ceballos & Co. had bought the new stock for 50 cents on the dollar, and then sold it to Heckscher as full-paid stock for what they paid for it, then Heckscher would not have been liable, unless he had notice of what Ceballos & Co. paid for it; and whether he had notice would have been for the jury. But that is not this case. We think the charge of the judge on this part of the case was, under the circumstances, correct. If Heckscher knew, at the time of his purchase of the stock, of the previous issue of the stock to Mumford for the licenses, he must be held to have had knowledge of the law that that transaction did not make the stock full paid and

nonassessable. And if he did not know that any such transaction had occurred he knew that he was paying $250,000 through Ceballos & Co. to the Syndicate for $500,000 of its stock. So that in either event he would be answerable to the trustee of the Syndicate in this action, unless he is relieved on some other ground. But Heckscher testified that at the time he bought this stock he did not know that it had ever been transferred to Mumford.

In something less than a year after the issue of the new stock Heckscher evidently learned that the issuance of the stock as full-paid when he had only paid 50 cents on the dollar for it was liable to involve him in trouble. He proposed to give back one-half of the issue and asked Ceballos & Co. to do the same. On September 1, 1906, he addressed a letter to Ceballos & Co. in which he inclosed the certificates for 5,000 shares and said:

"I have learned quite recently that the issue of this stock was made under a mistake, which in my judgment makes it proper that a rescission of the transaction be demanded. You will therefore be kind enough to turn over these certificates to the Syndicate, and to deliver to me, in exchange therefor, either the cash, $250,000, paid by me with interest, or else certificates for 2,500 shares of stock, for which the Syndicate has received cash at par.

"Very truly yours,                                  August Heckscher."

On the same day Ceballos & Co. wrote a letter to the Syndicate inclosing their certificates for 5,000 shares and Heckscher's certificates for 5,000 shares, and asked for either the return of $500,000 they paid for the 10,000 shares issued to them, or the cancellation of the stock and the issue of half the number of shares. The letter stated that:

"In view of the mistake on your part, it does not seem to us right or proper that the shares of stock issued should longer remain outstanding."

When on the stand, Heckscher was asked what the mistake was to which he referred in his letter to Ceballos & Co., and he answered that he could not tell, that the letter was written by counsel whom he had requested to look into the affairs of the Syndicate. And Mr. Fiske of the firm of Ceballos & Co. when on the stand was asked the same question and he also replied that he did not know, but that he had been requested by Heckscher to write the letter sent by Ceballos & Co. and he did it; that Heckscher said he (Heckscher) was asked to have that letter written by him (Fiske) on advice of counsel, and he did. He did not compose it, but was given the form and sent it.

[15] It is evident that Heckscher and Ceballos & Co. both desired to escape from liability to pay the $500,000 due on the $1,000,000 of stock which they had received for $500,000. The Syndicate was willing to release them by issuing 5,000 shares, in place of the 10,000 shares they originally delivered to them. But neither a board of directors nor the stockholders themselves can accept a surrender of shares and a release of a shareholder from liability thereon, when to do so would prejudice the rights of creditors. It could not be done if a single stockholder objected. Cartwright v. Dickinson, 88 Tenn. 476, 12 S. W. 1030, 7 L. R. A. 706, 17 Am. St. Rep. 910; Wills v. Nehalem Coal Co., 52 Or. 70, 96 Pac. 528; Shelby County R. Co. v. Crow, 137 Mo. App. 461, 119 S. W. 435. If all the stockholders agreed, it could not avail, if debts had been incurred which there were

no means to pay, except out of the capital stock which was released. For as against creditors capital stock and the liability attaching to it cannot be squandered or surrendered. Upton v. Tribilcock, 91 U. S. 45, 23 L. Ed. 203; Webster v. Upton, 91 U. S. 65, 23 L. Ed. 384; Potts v. Wallace, 146 U. S. 689, 13 Sup. Ct. 196, 36 L. Ed. 1135. And where a stockholder claims, as against a creditor or a trustee in bankruptcy, that he surrendered his stock, or the number of his shares was reduced at a time when and under circumstances which permitted it to be done, it would be incumbent on him to show that the time and circumstances were such that it could lawfully be done. Payne v. Bullard, 23 Miss. 88, 55 Am. Dec. 74. The defendant has shown nothing of the kind in this case.

[16] The stock herein involved was issued by a going concern by way of increase of capital, and it was issued at the value the original stock was selling on the market. So that we are confronted with the question whether stock so issued and sold makes the purchaser subject to creditors for the difference between the amount paid for the stock and its par value. A distinguished writer on the Law of Corporations states the law as follows:

"Rules of law forbidding the issue of shares for less than their par value, whether they be the result of judicial decisions or be laid down by the Legislature, have no application to the reissue of shares which, having been once legally issued, have by forfeiture, gift, or in any other legal mode reverted to the company; but such shares may be legally reissued or sold for whatever can be obtained for them. According to some strong American authorities, the same thing is true of shares issued by way of increase of capital by a going concern. Indeed, according to high authority, wherever a corporation has carried on business with its original authorized capital not fully subscribed, so that the shares have acquired a rating in the market, the unsubscribed shares of the original authorized capital may be issued for whatever they would bring in the market, even though less than par, and if the shares have no market value they may be issued gratuitously." 1 Machen on Corporations, § 779.

And in Handley v. Stutz, 139 U. S. 417, 11 Sup. Ct. 530, 35 L. Ed. 227 (1891) the Supreme Court said:

"The liability of a subscriber for the par value of increased stock taken by him may depend somewhat upon the circumstances under which, and the purposes for which, such increase was made. It it be merely for the purpose of adding to the original capital stock of the corporation, and enabling it to do a larger and more profitable business, such subscriber would stand practically upon the same basis as a subscriber to the original capital. But we think that an active corporation may, for the purpose of paying its debts, and obtaining money for the successful prosecution of its business, issue its stock and dispose of it for the best price that can be obtained. Stein v. Howard, 65 Cal. 616 [4 Pac. 662]. As the company in this case found it impossible to negotiate its bonds at par without the stock, and as the stock was issued for the purpose of enhancing the value of the bonds, and was taken by the subscribers to the bonds at a price fairly representing the value of both stock and bonds, we think the transaction should be sustained, and that the defendants cannot be called upon to respond * * * to the original stock of the company."

The question in the case involved a statute of Kentucky which provided as follows:

"Nothing herein shall exempt the stockholders of any corporation from individual liability to the amount of the unpaid installments on the stock

owned by them, or transferred by them, for the purpose of defrauding creditors; and an execution against the company may, to that extent, be levied upon the private property of such individual." Bullitt & Feland's General Statutes of Kentucky 1883, § 14, p. 549.

In Clark v. Bever, 139 U. S. 96, 11 Sup. Ct. 468, 35 L. Ed. 88, (1890) the court had before it a statute of the state of Iowa which declared that:

"Nothing herein contained exempts the stockholders of any corporation from individual liability to the amount of the unpaid installments on the stock owned by them." Revision 1860, § 1172.

And the court said:

"The local statute undoubtedly proceeds upon the ground that unpaid installments of stock subscribed constitute—no other rule being prescribed by legislative enactment—a trust fund for the benefit of creditors. But it does not declare that a corporation is without power, under any circumstances whatever, to dispose of its stock at less than par, or that stock purporting to be full paid shall, in all cases, and without reference to the circumstances under which it was acquired, be deemed unpaid to the extent that the amount given for it by the owner, whether in money or in property, was less than its face value. On the contrary, the statute itself imposes no express restriction upon the disposition by a corporation of its stock except such as is imposed upon individuals, and prescribes no rule in respect to the liability of a stockholder to creditors except that, when corporate property cannot be found to pay a judgment creditor, his private property may be seized under the execution to the extent of any unpaid installments on the stock owned by him. Whether any such indebtedness really exists upon the part of a particular stockholder, and whether he in law or in fact owes any sum on the stock held by him, was left by the statutes to be determined in each case, upon its own circumstances, and in accordance with the principles of general law touching the rights and liabilities of creditors and stockholders. If the Legislature had intended that the acquisition of stock at less than its face value should be conclusive evidence in every case that the stock, as between creditors and stockholders, is 'unpaid,' it would have been easy to so declare, as has been done in some of the states. If such a rule be demanded by considerations of public policy, the remedy is with the legislative department of the government creating the corporation. A rule so explicit and unbending could be enforced without injustice to any one, for all would have notice from the statute of the will of the Legislature. It is not for the courts by mere interpretation of a statute, not justified by its language, to accomplish objects that are within the exclusive province of legislation."

This makes it necessary to consider whether the New Jersey Corporation Act, under which the stock herein involved was issued, is similar to the Kentucky and Iowa statutes, or whether the New Jersey act is so explicit that it cannot be said of it that it leaves the question whether any indebtedness exists upon the part of the stockholders to be determined upon its own circumstances. The New Jersey act reads as follows:

"Where the whole capital of a corporation shall not have been paid in, and the capital paid shall be insufficient to satisfy its debts and obligations, each stockholder shall be bound to pay on each share held by him the sum necessary to complete the amount of such share, as fixed by the charter of the corporation, or such proportion of that sum as shall be required to satisfy such debt and obligation." P. L. 1896, p. 284, § 21.

We therefore hold that the doctrine of Handley v. Stutz and of Clark v. Bever cannot be invoked to protect Heckscher from paying

to the trustee of the bankrupt corporation the amount unpaid on his stock.

At the trial the plaintiff put on the stand an attorney and counselor at law practicing in New Jersey and asked him whether so much of the decision of Handley v. Stutz as held that under certain circumstances the stock of a corporation might be sold for less than its par value found any support in the decisions of New Jersey. He replied that in his judgment certain of them which he mentioned—See v. Heppenheimer, Easton National Bank v. American Brick & Tile Co., Hebberd v. Southwestern Land & Cattle Co., 55 N. J. Eq. 18, 36 Atl. 122, and Holcombe v. Trenton White City Co.—were inconsistent with that case and had practically determined it otherwise. He testified, too, that the case of Hebberd v. Southwestern Land & Cattle Co., supra, decided exactly the same point in a different way. He also stated that under the law of New Jersey, where there is a transfer of shares which have not been fully paid for, that the transferee is liable for the balance on his shares, unless he can show that he has acquired those shares in the ordinary course of business for full value and without notice of the fact that there was an unpaid amount or illegality about the issue of the shares.

The defendant also called a counselor at law of New Jersey, and asked him whether the courts of New Jersey had passed on this doctrine of Handley v. Stutz, and he replied that the doctrine had never been definitely passed upon by the courts of that state. We have examined the cases cited by the plaintiff's expert. They are cases relating to the issue of original stock, and do not raise the question directly involved in Handley v. Stutz. It is a delicate and not always satisfactory task for the courts of another jurisdiction to declare the law of a state. But the courts of New Jersey do not seem to have expressly decided whether the doctrine of Handley v. Stutz is or is not applicable to the Corporation Act of that state. We do not rest our decision upon the testimony of the experts but upon what seems to us to be the meaning of the legislative act.

[17] This brings us to consider the question of interest. The trial judge instructed the jury that, if they determined that there was overvaluation, the trustee would be entitled to recover interest on the amount remaining unpaid from the time Heckscher received the stock, "because from that time he would have been entitled to draw dividends, if any had been earned and declared." This would make interest begin to run from November 8, 1905. The general rule seems to be that interest runs on an unpaid stock subscription, not from the time a stockholder receives his stock, and is entitled to draw dividends, but from the time payment for the stock is due. Where there is no express promise to pay interest it is recoverable upon the theory that it is damages for the retention of money due and unpaid. The time when interest begins to run in a case of this kind is settled for us by the rule adopted in New Jersey. In See v. Heppenheimer, supra, interest was allowed from the time the stock was acquired. The District Judge did that and there is no error.

Judgment affirmed.