KNICKERBOCKER IMPORTATION COMPANY, PROSECUTOR AND DEFENDANT IN ERROR, v. STATE BOARD OF ASSESSORS ET AL., DEFENDANTS AND PLAINTIFFS IN ERROR.

Submitted July 9, 1906—Decided March 4, 1907.

1. Under the "Act concerning corporations" (Revision of 1896) there is an implied grant of power to corporations to purchase shares of their own capital stock, if such purchase is for a legitimate corporate purpose, but not otherwise. *Held*, that under the circumstances disclosed by the record, the prosecutor could not acquire its own stock for the purpose of creating so-called treasury stock, such purpose not being a "legitimate corporate purpose."

2. Stock once issued is and remains outstanding, within the purview of the Franchise Tax act, although owned by the corporation issuing the same, until retired and canceled as provided by statute for the reduction of capital stock.

---

On error to the Supreme Court. For opinion of the Supreme Court, see 44 *Vroom* 94.

For the plaintiffs in error, *Robert H. McCarter,* attorney-general.

For the prosecutor and defendant in error, *Ruliff V. Lawrence.*

The opinion of the court was delivered by

DILL, J.    The prosecutor and defendant in error is a corporation under the "Act concerning corporations." The certificate of incorporation, filed September 21st, 1903, declared its corporate purpose to be the importation and sale of wines and liquors, but contained no power or authority to purchase, to hold or to reissue the shares of its own capital stock, and fixed its authorized capital at $500,000.

Upon the organization of the company, September 26th, 1903, an agreement was made between the prosecutor and the Cazanove Champagne Company, a corporation of New Jersey, by which the prosecutor was to take over the assets (specified only as the "rights and everything" of the Cazanove Champagne Company) and undertake the liabilities (neither specified nor described) of the latter company, and to issue, as the consideration therefor, its entire authorized capital stock, consisting of one thousand shares of preferred stock and four thousand shares of common stock, par value $100 each, which the Cazanove Champagne Company agreed to take and thus to pay for.

As part of the same transaction, and provided for in one and the same contract, the Cazanove Champagne Company agreed to turn back at once, upon receipt of the issued stock, three hundred and fifty-nine shares of preferred stock and three thousand three hundred and fifty-nine shares of common stock, amounting at par to $371,800, for the expressed purpose of assisting the prosecutor in procuring the necessary working capital, the stock to be sold as treasury stock, full paid and non-assessable.

The entire stock was accordingly issued in the name of and delivered to the Cazanove Champagne Company in two certificates. These certificates were endorsed in blank by the Cazanove Champagne Company, returned to the prosecutor and new certificates for stock, amounting to $128,200, issued to the Cazanove Champagne Company.

The prosecutor, by formal resolution, declared the whole issue of $500,000 full paid and non-assessable, and so reported to the state, certifying the whole issue as fully paid.

The $371,800 of stock was entered on the prosecutor's books as a surplus asset, designated as full-paid treasury stock, and the $500,000, the estimated value of the property thus purchased, was credited as against the $500,000 of stock issued.

Subsequently, the prosecutor sold two hundred and fifty-eight shares of the treasury stock.

The prosecutor filed its report with the state board of assessors, stating, as of January 1st, 1904, that its entire issue of $500,000 was fully paid, but that prior to January 1st, 1904, three thousand four hundred and sixty shares had been returned to the treasury and claiming that therefore only $154,000 of its stock was issued and outstanding on that day.

The state board of assessors fixed the franchise tax at one-tenth of one per cent. upon $500,000 of stock issued.

The prosecutor insisted that the tax was illegal, "because stock which has been issued and subsequently returned into the treasury and accepted by its board of directors as treasury stock cannot be considered as outstanding," and upon a writ of *certiorari* the Supreme Court held accordingly that the corporation was not taxable upon the shares of its own stock thus acquired and held by it, and reduced the franchise tax from $500 to $154. 44 *Vroom* 94.

From the foregoing statement of fact it appears that there was, in the first instance, a binding subscription by the Cazanove Champagne Company for the full authorized stock issue of $500,000. This subscription fixed the basis of the franchise tax, irrespective of the question of the regularity or validity of the issue. *American Pig Iron Storage Co.* v. *State Board of Assessors,* 27 *Vroom* 389.

Because the entire authorized capital of $500,000 was issued and delivered to the Cazanove Champagne Company, the prosecutor was "taxable with respect to the amount of capital stock issued and outstanding as a fixed factor, without regard to the purpose for which the capital stock was issued or whether it was issued for value or not." *Storage Battery Co.* v. *State Board of Assessors,* 31 *Vroom* 66 (at *p.* 69); *affirmed,* 32 *Id.* 289.

The answer of the prosecutor is that because the corpora-

tion had acquired, by purchase or donation, all of the original outstanding issue of $500,000, excepting stock of the par value of $154,000, therefore the corporation was only liable to be taxed in the sum of $154.

This position of the prosecutor is challenged upon two grounds—*first,* that the prosecutor could not legally acquire its own stock by purchase or donation for the purpose disclosed by the record, because it was not a "legitimate corporate purpose;" and *second,* that stock once issued remains outstanding and subject to the franchise tax until retired and canceled in the method prescribed by our Corporation act for the reduction of capital stock.

Under the Corporation act of 1896 there is an implied grant of power to corporations to purchase shares of their own capital stock, provided such purchase is required for legitimate corporate purposes, but not otherwise. *Chapman* v. *Ironclad Rheostat Co.,* 33 *Vroom* 497; *Berger* v. *U. S. Steel Corporation,* 18 *Dick. Ch. Rep.* 809.

Vice Chancellor Stevens succinctly summarizes the decisions and illustrates correctly the limitations of the rule. *Oliver* v. *Rahway Ice Co.,* 19 *Dick. Ch. Rep.* 597.

Therefore, the attempt of the prosecutor to acquire its own stock was ineffectual unless for a "legitimate corporate purpose," and the burden of demonstrating the legitimacy of its purpose is upon the prosecutor.

The proofs in this case fall short of such demonstration.

The purpose of the prosecutor in acquiring this stock is manifest, because this purchase is but a part of an entire transaction. The organization of the prosecutor, the subscription by the Cazanove Champagne Company, the issuance of the stock and the return thereof were all provided for in the same contract—were concurrent transactions—the purpose of the whole undertaking being to create so-called treasury stock and dispose of it upon the representation that it was fully paid and non-assessable and at a price inferentially below par and out of the proceeds to provide working capital for the prosecutor.

The Cazanove Champagne Company subscribed for

$500,000 of the stock of the prosecutor. The prosecutor could not satisfy this obligation by accepting a less value, either in cash or property, and the Cazanove Champagne Company could not, even with the consent or the connivance of the prosecutor, discharge itself of the liability to pay its subscription in full by paying a less sum either in money or property. Our statutes expressly forbid it.

There is no adequate proof of dollar for dollar value in the property received by the prosecutor for the stock. issued therefor.

The property is described as "the rights and everything" of the Cazanove Champagne Company. There is no other description of the property or competent proof of its tangibility or value.

The allegations of assumption of liability by the prosecutor are not evidence and are of no assistance in determining the actual value received, because there is no proof as to the extent or substantiability of the liability.

The transaction was practically this:

The prosecutor issued $500,000 of its stock to the Cazanove Champagne Company, receiving certain undescribed, indefinite rights which were placed upon the books of the prosecutor as an asset at a valuation of $500,000. As part of the same transaction, and expressly provided for in the contract, the Cazanove Champagne Company forthwith returned $371,-800 of this issue to the prosecutor, retaining only $128,200 of stock.

This appears to have been the net consideration for the property transferred.

The record lacks the facts essential to a judicial determination that this $128,200 of stock was fully paid and non-assessable. Nevertheless, if this be granted, the position of the prosecutor, that the Knickerbocker Importation Company thus required a *bona fide* paid-up capital of $500,000 and a surplus represented by $371,800 par value of full-paid stock, cannot be sustained. This $871,800 of book assets, capital and surplus, consist only of the property for which, stripped of all indirection, the prosecutor paid $128,200 in stock.

We are not warranted by the evidence in finding that this growth of $128,200 (into $871,800) of assets, a net increase of $743,600 in valuation, was a legitimate transaction and one for the accomplishment of which the prosecutor might lawfully acquire its own stock. This increase of assets was justified only by evidence of bookkeeping entries and resolutions of the directors.

Neither bookkeeping nor mere recitative language in resolutions of a board of directors creating values can be accepted as the equivalent of the proof of *bona fide* value required by our statute where stock is issued for property purchased.

Judged by the rule either of "good faith" or "true value," as applicable to stock issues, the proofs in this case do not satisfy us of the legality of this transaction.

Whether the statute (*Pamph. L.* 1905, *p.* 501), to which we have been referred, has any application to such situation is not pertinent to this decision.

We are forced to the conclusion that the record does not demonstrate a "legitimate corporate purpose" in the subscription, issue and return of this stock. The law, therefore, declares such transactions invalid. *Morawetz Corp.* (2d ed.), § 112; *Maryland Trust Co.* v. *National Mechanics Bank,* 63 *Atl. Rep.* 70.

But if we had reached an opposite conclusion, the result would be the same.

The contention of the prosecutor is that the amendment contained in the act of 1892, by which, in the fourth section of the act of 1884, the words "issued and outstanding" were added to the words "capital stock," changed the law and enabled the corporation, by the acquisition of its shares by purchase or donation, to withdraw such shares from the class of stock issued and outstanding and thus to reduce the amount of the franchise tax to the extent of the shares thus acquired.

This has been otherwise determined, and we think correctly, by the Supreme Court.

Justice Depue said: "By several acts passed in 1878, 1879 and 1885 (*Rev. Sup., pp.* 151, 152) incorporated companies were empowered to increase or decrease their capital stock.

In amending the fourth section of the act of 1884 by the act of 1892, the words 'issued and outstanding' were inserted after the words 'capital stock,' with a view to adapt that section more clearly to such changes in the capital stock of these corporations. This verbal change in expression made no material alteration in the meaning of the law." *American Pig Iron Storage Co.* v. *Assessors, 27 Vroom* 389 (at *pp.* 393, 394).

The "Act concerning corporations" (*Pamph. L.* 1896, *p.* 277, §§ 27, 29, 30) provides for the method of retiring, reducing or decreasing capital stock. It throws certain safeguards about, and imposes certain restrictions upon, such changes and alterations in the corporate organization, requiring certain proceedings on the part of both directors and stockholders, and notice by publication, and expressly providing against the release from liability of stockholders for unpaid stock, and against the release from obligations of the corporation to the state.

In Siegman *v.* Electric Vehicle Co., decided at this term of this court (65 *Atl. Rep.* 910), Mr. Justice Pitney, speaking for this court and referring to the reduction of capital stock in connection with sections 27, 29 and 30 of the "Act concerning corporations" (Revision of 1896), says:

"Taking the three sections together, they are designed to make sure—*first,* that capital shall not be reduced by indirection nor without deliberate and considered action taken for that avowed purpose, first by the directors and afterwards by two-thirds in interest of the stockholders, each stockholder having reasonable notice of the meeting and of the purpose for which it is called; and *secondly,* that formal written evidence of the action taken is to be lodged with the secretary of state and published in a newspaper, to the end that all the world may be apprised thereof."

Irrespective of the prohibitions contained in section 30 of the Corporation act, the creation by the legislature of a precise method by which, under certain conditions, stock may be retired and canceled, is a clear expression of an intention that such corporation shall accomplish this same result in no other way.

A parity of reasoning is found in those cases which hold that the effect of a separate act of the legislature providing for the organization of a class of corporations, or corporations with certain powers, in ways and under conditions inconsistent with or different from those prescribed by the "Act concerning corporations," is to prohibit their organization under the "Act .concerning corporations." *Richards* v. *Dover*, 32 *Vroom* 400; *Domestic Telegraph and Telephone Co.* v. *Newark*, 20 *Id.* 344; *Montclair Military Institute* v. *Assessors*, 36 *Id.* 516.

The prosecutor could not avoid its liability to the state to pay a franchise tax based upon the stock issue of $500,000 by corporate in-buying of its own stock.

Stock once issued is and remains outstanding until retired and canceled by the method provided by statute for the retirement and cancellation of capital stock; and the words "retirement" and "cancellation," wherever used in the Franchise Tax act or in the amendment of that act in the laws of 1906, to which we have been referred (*Pamph. L., p.* 31), must be interpreted to mean permanent retirement and actual cancellation by the method and in full compliance with the provisions of the statute.

The original assessment by the state board of assessors was lawfully made and should be affirmed, and the judgment of the Supreme Court should be reversed.

*For affirmance*—None.

*For reversal*—THE CHANCELLOR, CHIEF JUSTICE, GARRISON, FORT, GARRETSON, HENDRICKSON, PITNEY, REED, TRENCHARD, BOGERT, VREDENBURGH, VROOM, GREEN, GRAY, DILL, J.J.    15.