## BORG et al. v. INTERNATIONAL SILVER CO.

(Circuit Court of Appeals, Second Circuit. August 4, 1925.)

No. 372.

**1. Corporations ⊙═68—Own stock acquired by corporation held not retired as between corporation and state.**

Where corporation acquired some of its own stock without taking steps to retire it, under Corporation Law N. J. § 27, stock was not retired as between corporation and state.

**2. Corporations ⊙═68—Purpose of by-law prohibiting corporation dealing in its own stock considered on issue of corporation's intent as to retirement in acquiring its own stock.**

In determining whether it was corporation's intent to retire stock acquired when it dissolved another corporation, which owned such stock, held, that purpose of by-law prohibiting corporation from dealing in its own stock could be considered, regardless of its legal effect.

**3. Corporations ⊙═376—By-law prohibiting corporation from "buying" or otherwise "dealing" in its own stock held not applicable to stock acquired on dissolution of subsidiary.**

By-law prohibiting corporation from "buying," selling, or "otherwise dealing" in its shares without consent of stockholders, was not applicable to stock acquired on dissolution of subsidiary corporation, which owned it; "dealing" implying trade between two opposite parties.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Deal—Dealing.]

**4. Corporations ⊙═65—Treasury stock held not "outstanding."**

Treasury stock is not "outstanding"; such stock not being effective obligation against corporation.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Outstanding.]

**5. Corporations ⊙═68—Failure to carry stock acquired by corporation as asset and liability held not to show that it was retired.**

That its own stock acquired by corporation was not carried as asset and liability on corporation's books held not to show that stock was retired; such stock constituting only an opportunity to acquire new assets by creating new obligations.

**6. Corporations ⊙═152—Not unlawful in New Jersey to pay dividends out of profits, though capital is impaired.**

It is not unlawful in New Jersey to pay dividends out of profits, though capital be in fact impaired.

**7. Corporations ⊙═152—Dividends lawfully paid by New Jersey corporation under New Jersey laws are not unlawful in New York, where corporation does business.**

Dividends lawfully paid by New Jersey corporation under New Jersey laws are not un-

lawful in New York under New York laws, because corporation does business in New York.

**8. Corporations ⊙═68—Evidence held to show that corporation did not intend to retire its own stock acquired by it.**

Evidence held to show that corporation did not intend to retire some of its own stock, acquired by it on dissolution of subsidiary corporation owning such stock.

**9. Corporations ⊙═68—Agreement to retire common stock, which would leave less than $700,000 of common to about $6,000,000 of preferred stock, held void.**

Under Corporation Law N. J. § 18, limiting amount of preferred stock to two-thirds of capital stock issued, agreement to retire portion of common stock, which would leave less than $700,000 of common to about $6,000,-000 of preferred stock, would be void.

**10. Corporations ⊙═74—Stockholders have prior right to subscribe for new stock, but not to treasury stock.**

Stockholders have prior right to subscribe for new stock, but not to treasury stock.

**11. Injunction ⊙═137(4)—Courts will maintain status quo, if directors use their powers to get control of corporation stock, even if case is doubtful.**

If directors use their powers in sale of stock to get control of corporation stock, or in any way other than in honest exercise of their discretion, court will maintain status quo till hearing, even if plaintiff's case is doubtful.

**12. Corporations ⊙═76—Sale of treasury stock to highest bidder held proper method of sale by corporation; "value."**

Sale of treasury stock to highest bidder on sealed bids given wide publicity held proper method to procure full value; "value" being what persons will pay for shares, given as wide an opportunity for bidders to come in as is reasonably possible.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Value.]

**13. Injunction ⊙═71—Sale of treasury stock by directors not enjoined on suspicion.**

Sale of treasury stock by directors will not be enjoined on mere suspicion as to directors' motives.

**14. Corporations ⊙═316(3)—Directors cannot use to their own profit information as to value of treasury stock not available to other bidders.**

Directors cannot use to their own profit any information as to value of shares not available to other bidders at public sale thereof.

Appeal from the District Court of the United States for the Southern District of New York.

Suit by Sidney C. Borg and another against the International Silver Company. From an interlocutory decree of the District Court (11 F.[2d] 143), denying plaintiffs'

motion for an injunction pendente lite, plaintiffs appeal. Affirmed.

See, also, 2 F.(2d) 910.

Appeal from an interlocutory decree denying a motion for an injunction pendente lite. The suit was originally filed by the plaintiffs, common shareholders of the defendant company, to enjoin it from selling 6,000 shares of its common stock to shareholders, common and preferred, at $50 a share, in the proportion of one share for each ten of their existing holdings. The defendant conceded that this was to be only the first installment of sales by which it proposed to raise some $800,000 or $900,000 for its corporate purposes. The plaintiffs moved for a preliminary injunction against this proposed action, and the court enjoined the sale. Thereafter the defendant publicly offered the same shares at open competitive sale to the highest bidders on sealed bids. The bill was then amended, and an injunction prayed against this second sale. On motion for preliminary injunction, the court refused so to order, and this appeal results.

The controversy depends, first, upon the question whether the common shareholders have a pre-emptive right to buy the shares; and second, assuming this not to exist, whether the defendant's directors are making the sale, not for the honest purpose of raising funds, but to secure the shares at less than their value. The defendant was organized in 1898 under the laws of New Jersey to manufacture and sell silverware. Its certificate authorized the issue of $20,000,000 of capital stock—$9,000,000 preferred, and $11,000,000 common. The common shares were to have no votes until January, 1902, and thereafter only at the rate of one vote for two shares, as against the preferred's right of one vote for each share. Shortly thereafter, under circumstances not pertinent to this appeal, the defendant issued $5,107,500 of its preferred shares and $9,944,700 of its common. In 1902 $9,068,000 of the common shares and $515,000 of the preferred, constituting a control, had come into the hands of a firm of the name of Thomas & Thomas, who conveyed them to a corporation organized by them for the purpose, known as the United States Silver Corporation. Thomas & Thomas also conveyed to their company certain shares of a Connecticut corporation, C. Rogers & Bros. Company, and these, with the shares in the defendant, constituted all the assets of that company.

Thomas & Thomas held all the capital stock of the United States Silver Corporation, and $3,000,000 out of $3,150,000 of its bonds; the remaining $150,000 being issued to C. B. Rogers & Bros. Company. The defendant wished to obtain their interests, probably to prevent control of itself, and for that purpose bought all their holdings in the United States Silver Corporation by issuing to them $1,500,000 in new preferred shares of its stock, and $2,000,000 of its bonds (3,900,000 having been issued to others during 1898). This was towards the end of the year 1902, the transaction being finally consummated on January 7th of 1903.

Thus matters stood until April 15, 1908, when the directors of the defendant passed a resolution that the company should acquire all the assets of the United States Silver Corporation "in consideration of an agreement by this company to assume, pay, and discharge all the debts, obligations, and liabilities of such corporation." On June 22, 1908, the defendant and its directors as sole stockholders of the United States Silver Corporation by unanimous consent dissolved that company under the New Jersey statute and acquired its assets, among them the shares of the defendant's stock formerly held by Thomas & Thomas, including $9,068,000 of the common. The shares to be sold are a part of the common shares so acquired.

Up to and including December 31, 1907, the balance sheet issued by the defendant had shown among its liabilities preferred shares amounting to $6,670,500, and common to $9,944,700. On December 31, 1908, this was changed, and the share liability read as follows:

| | | |
|---|---|---|
| Capital stock, preferred (issued).. | $6,607,500.00 | |
| Less in treasury.. | 578,912.50 | |
| | | $6,028,587.50 |
| Capital stock, common (issued) ... | $9,944,700.00 | |
| Less in treasury.. | 9,249,300.00 | |
| | | 695,400.00 |

A reduction was also made in the assets of over $11,000,000, a large part of which was apparently due to marking down the item of trade-marks and patents, although this does not clearly appear. Upon this balance sheet appeared the following note: "The United States Silver Corporation has been dissolved, and its assets transferred to the International Silver Company, which accounts for the reduction in the amount outstanding of preferred and common stock and the corresponding reduction in 'plant investment' and ' other investments.' " The balance sheets for every subsequent year stated the

preferred and common share liability in the same form, with immaterial variation.

On July 31, 1903, the defendant's board of directors passed an amendment to its by-laws, as follows: "The company shall be prohibited (except for retirement and for the purpose of decreasing the capital ·stock as authorized by law) from buying, selling or otherwise dealing in shares of its own stock * * * except upon the consent in writing of stockholders of the company owning at least two-thirds of the capital stock," or upon a similar vote at an annual meeting, or at a special meeting called for the purpose. As appears from correspondence at the time between the defendant and the Stock Exchange, the defendant took this action in order to secure quotation of its preferred shares among the unlisted securities of the New York Stock Exchange, which required that any company whose stocks were quoted should bind itself not to speculate in its own securities. The by-law above recited was repealed in 1913.

The plaintiffs also alleged in their affidavits certain conduct of the defendant's directors which they insisted showed their disposition to deal unfairly with the common stockholders, in especial the purchase of a plant of the Colt Company for 2,500 common shares upon a valuation of $50 a share in 1923. At this time the book value of the common shares was very much greater. In 1924 they had sold as high as $140, and in 1923 had varied in price between $20 and $68. No dividends have ever been paid upon them, and unpaid dividends have accumulated upon the preferred, including scrip, to the amount of $1,500,000. The average bank loans in the years 1923 was somewhat short of $1,500,000, and about $1,800,000 of debentures fall due in 1933. However, the company has been very prosperous; its average net earnings for the period from 1919 to 1922 being $1,100,000.

Cook, Nathan & Lehman and Walter C. Noyes, all of New York City, Lindley M. Garrison, of Jersey City, N. J., and Alfred A. Cook and Frederick F. Greenman, both of New York City, for appellants.

Simpson, Thacher & Bartlett, Julius M. Mayer, Graham Sumner, and Percival E. Cowan, all of New York City, for appellee.

Before ROGERS, MANTON, and HAND, Circuit Judges.

HAND, Circuit Judge (after stating the facts as above). [1] We do not see how it can be thought that the shares in question were in fact retired. The New Jersey statute (section 27, N. J. Corporation Law [P. L. 1896, p. 277]), prescribed a method by which this could be done, and there was no pretense of following it. As between the state and the defendant, the shares were certainly not retired. Knickerbocker Importation Co. v. State Board of Assessors, 74 N. J. Law, 583, 65 A. 913, 7 L. R. A. (N. S.) 885. We shall for argument's sake assume, without deciding, that the defendant might have so conducted itself as to create an obligation, presumably sounding in contract, with the common shareholders by which it was bound to treat the shares in question as retired, leaving the formalities to be observed later. Just what the consideration for such a contract could be, and how any implied promise could therefore become binding, we do not stop to inquire, since we think that from nothing shown can a promise be inferred of that purport. It is this which we consider.

[2] The only substance which we can find in the plaintiffs' contention arises from the resolution of January 31, 1903. In the first place, it is clear that at least its purpose was quite different. Its origin shows that it was meant only to prevent the defendant from speculating in its stock. While nominally the shares here in issue were not its property on January 31, 1903, in substance they were. The defendant owned every title of proprietary interest in the shares of the United States Silver Corporation and all but $150,000 of its bonds. When it took formal action of dissolution and acquired the shares, it paid nothing for them, and did no more than make their status legally what it had in every other sense been before. This was not to speculate in its shares and would presumably not have been so regarded by the Stock Exchange. It is, indeed, argued that its purpose was irrelevant, if the language of the resolution covered the transaction; but this is not true. We are not concerned with whether, in the face of the by-laws, the shares could actually pass to the defendant; each side asserts that. Rather the question is what must be the reasonable inference of the defendant's intent from its action in taking them over. Upon that issue the purpose of the resolution, quite independently of its legal effect, is pertinent.

Assuming that the defendant is not to be presumed to act in contradiction of its own by-laws, such a presumption becomes a fiction when applied to a by-law which was clearly not intended to cover such a transaction, whatever its effect in law. The ques-

tion being one of fact—i. e., the reasonable significance of the transfer—such considerations are relevant. Moreover, presumption against presumption, any deduction is canceled, because, if the common shares had been retired, or were bought to be retired, the resulting distribution between the common and preferred stock would have violated section 18 of the New Jersey Corporation Law, a point we consider below in another connection. Thus at the outset we cannot see that there was any basis for the conclusion urged by the plaintiffs.

[3] But further, and considering the resolution strictly, and accordinging to its legal tenor, we think that it did not apply to the case. It forbade the defendant from "buying, selling, or otherwise dealing" in its share. The defendant did not "buy" these shares, whatever it may have called the transaction. It gave no consideration, and needed none, except by assuming the indebtedness of the United States Silver Corporation, an obligation which the law would in any case have imposed upon it, since otherwise the transfer would have been in fraud of creditors. It seems to us an undue strain upon its meaning to extend the word "buying" so far. Besides, even in the strictest interpretation of the resolution, we are not to forget the circumstances of its adoption. It is to be construed to effect its purpose, which, as we have shown, was quite different. Nor do we regard the phrase, "otherwise dealing" in its shares, as making any difference. "Dealing" implies ordinarily a trade between two opposite parties, of which there was none here. The defendant was in substance both the transferor and the transferee.

[4] So we think that the resolution created no presumption that the defendant intended to retire the shares. But, if it did, the presumption would be rebutted by what took place at the time and thereafter. It is clear, from the way in which it treated the shares in 1908 and afterwards, that the defendant did not suppose the shares were retired, or were to be. If so, it would not have carried them as treasury stock for 15 years. We can construe the balance sheets in no other way. The shares should not have appeared in the sheets at all, or, if they did, only as held for retirement. To mark them as held "in treasury" was to ticket them as treasury shares; it could mean nothing else. The original note on the sheet for 1908 does not say anything to the contrary; they were not "outstanding," because they were held by the defendant; to be "outstanding," they must be effective obligations against it.

[5] Against this it is argued that the shares should have been carried among the assets either at cost—as prescribed by the Interstate Commerce Commission—or at par, and that the assets should not have been reduced. The affidavits are not clear as to the most approved way of carrying treasury shares, and anyway we think the issue immaterial. Such shares are of necessity retired in this sense: That they constitute no longer any liability of the defendant. A corporation can have no right of action against itself, as must be if the share is truly a liability. Indeed, the only difference between a share held in the treasury and one retired is that the first may be resold for what it will fetch on the market, while the second has disappeared altogether. Enright v. Heckscher, 240 F. 863, 874, 153 C. C. A. 549 (C. C. A. 2); Rural Homestead Co. v. Wildes, 54 N. J. Eq. 668, 35 A. 896; Cook on Corporations, § 286. Therefore the best way to state the facts in the corporation's accounts is merely a matter of form, and it can make no difference in the case at bar how it was done, so long as the intent appears.

To carry the shares as a liability, and as an asset at cost, is certainly a fiction, however admirable. They are not a liability, and on dissolution could not be so treated, because the obligor and obligee are one. They are not a present asset, because, as they stand, the defendant cannot collect upon them. What in fact they are is an opportunity to acquire new assets for the corporate treasury by creating new obligations. In order to indicate this potentiality, it may be the best accounting to carry them as an asset at cost, providing, of course, all other assets are so carried. Even so, a company which revalued its assets might properly carry them at their sale value when the revaluation was made. In any event there can be no ambiguity in stating the facts more directly, as the defendant did; that is, in treating the shares as not in existence while held in the treasury, except as a possible source of assets at some future time, when by sale at once they become liabilities and their proceeds assets. It makes no difference whether this satisfies ideal accounting or not.

Nor do we see any relevant evidence of intent in writing off some of the assets, whatever they were. As we have said the liabilities had been reduced, because treasury shares cannot be such, save by an accountant's fiction. If the defendant found the occasion serviceable to reduce the book value of its assets, whether because it wished to "squeeze out the water," or because they had

in fact changed in value, we do not see how anything can be deduced from that purpose. The sheet became more nearly true, whether the shares were held in the treasury or retired; the reduction was equally consistent with either hypothesis.

[6, 7] Again we cannot accede to the plaintiffs' argument that the payment of dividends on the preferred was unlawful if the shares had not been retired. We understand this to be thought a makeweight in ascertaining the corporate intention, and we treat it as such, passing the question of whether it should be so regarded. It is not unlawful in New Jersey to pay dividends out of profits though the capital be in fact impaired. Goodnow v. American Writing Paper Co., 73 N. J. Eq. 692, 69 A. 1014. The plaintiffs, apparently recognizing this, and that there is no evidence that any dividends were illegally paid under New Jersey law, resort to the curiously fanciful argument that nevertheless the payments were unlawful under the law of New York, where the defendant did part of its business. German-American Coffee Co. v. Diehl, 216 N. Y. 57, 109 N. E. 875. That case does not decide that a dividend paid by a New Jersey corporation lawfully under the laws of New Jersey may be unlawful in New York, because the corporation does business there under a New York license. The payment there at bar was unlawful in New Jersey, as well as in New York, and the court merely held that the New York directors were liable for the repayment under New York law. We hardly suppose that one rule applies to a New Jersey corporation in New Jersey and another in New York; but, if so, at least it has never been so held, and it is the flimsiest possible assumption that the defendant's directors acted with any such possibility before them.

[8, 9] So much, therefore, for the evidence upon which the plaintiffs rely to prove that by its conduct the defendant has indicated any intent to retire the shares. It is apparent to us that exactly the opposite was the fact, and that it meant to keep them available for sale as assets, exactly as it proposes now to do. But, if it meant to retire them, that would have been an unlawful project. The resulting distribution of shares would have left less than $700,000 of common, and about $6,000,000 of preferred. Section 18 of the New Jersey Corporation Law prescribes that at no time shall the preferred shares exceed two-thirds of the capital stock issued. An agreement to effect that result would have been void; no court might enforce it, or anything that depended on it.

Tooker v. Sugar Refining Co., 80 N. J. Eq. 305, 84 A. 10.

[10] In no view, therefore, can the plaintiffs prevail on the notion that the shares were retired. We do not understand that they maintain that shareholders have a pre-emptive right in treasury shares. If so, the cases, of which there are not many, are against them (Enright v. Heckscher, supra; Page v. Smith, 48 Vt. 266; Hartridge v. Rockwell, R. M. Charlt. [Ga.] 260; Crosby v. Stratton, 17 Colo. App. 212, 68 P. 130; Cook on Corporations, § 286), though the right is well settled when new shares are sold after an increase of capital stock (Stokes v. Continental Trust Co., 186 N. Y. 285, 78 N. E. 1090, 12 L. R. A. [N. S.] 969, 9 Ann. Cas. 738; Electric Co. v. Edison, etc., Co., 200 Pa. 516, 50 A. 164; Way v. American Grease Co., 60 N. J. Eq. 263, 269, 47 A. 44; Gray v. Portland Bank, 3 Mass. 374, 3 Am. Dec. 156).

The distinction may appear tenuous, but rests upon the effect which a new issue has upon the voting control of the company. When a person buys into a company with an authorized capital, he accepts that proportion of the voting rights which his purchase bears to the whole. This applies certainly so far as the other shares are issued at the same time, and perhaps, also, though they are issued much later. But treasury shares have by hypothesis once been issued, and have diluted, as it were, the shareholder's voting power ab initio. He cannot properly complain that he is given no right to buy them when they are resold, because that merely restores the status he originally accepted. All he can demand is that they shall bring to the corporate treasury their existing value. If they do, his proportion in any surplus is not affected. However, when the capital stock is increased beyond the original amount authorized, the voting power is diluted along with it; the shareholders who had not originally bought into so large an issue may insist that the old proportions be observed. To deprive them of their right of pre-emption is to change their contract. At any rate it is only on this theory that any right of pre-emption exists, and since the shares at bar were never bought to be retired, and the capital was not increased, the right does not exist.

[11] There remains only the question whether the plaintiffs have made out the second part of their complaint; that is, that the directors are selling the shares, not honestly to raise money, but to get possession of the common stock. Courts have, indeed, not been slow

when this is shown to interfere, even though the shares to be sold were or were treated as treasury stock. Luther v. C. J. Luther Co., 118 Wis. 112, 94 N. W. 69, 99 Am. St. Rep. 977; Elliott v. Baker, 194 Mass. 518, 80 N. E. 450; Essex v. Essex, 141 Mich. 200, 104 N. W. 622; Dunn v. Acme, etc., Co., 168 Wis. 128, 169 N. W. 297. If it appeared here that the directors were using their powers to get control, or in any way other than in the honest exercise of their discretion, we ought to maintain the status quo till hearing, even though the plaintiffs' case were doubtful. The supposed abuse of their powers depends upon two questions: First, whether the method they adopted was likely to get the full value of the shares; second, whether there was any occasion for the sale at all.

[12] As to the first, we can see no reasonable doubt. The suggestion that the book value of the shares is any measure of their actual value is clearly fallacious. It presupposes, first, that book values can be realized on liquidation, which is practically never the case; and, second, that liquidation values are a measure of present values. Every one knows that the value of shares in a commercial or manufacturing company depends chiefly on what they will earn, on which balance sheets throw little light. When all is said, value is nothing more than what people will pay for the shares, given as wide an opportunity for bidders to come in as is reasonably possible. Whether these shares should be sold at auction, or as the defendant proposes, was certainly for the directors; we have no opinion on the matter, and there is nothing in the proofs to challenge the way selected. As wide publicity as was reasonable was given, and so far as we can see the sale is as likely to realize full value as any that can be devised. That is all the plaintiffs may ask, if the shares are to be sold at all.

[13] Whether they should be sold at all is a more difficult question, dependent really on what the directors honestly think. The Colt transaction may have been improper; we cannot try it here. The first proposed sale, which was enjoined, we may assume to have been improper. Together we will not say that they throw no suspicion on the directors' motives. But suspicion is hardly enough, un-

less the balance of advantage weighs very strongly in the plaintiffs' favor. At least a plausible defense may be made for the directors' decision. It is essential to pay off the cumulated preferred dividends before the common shares can be put on a paying basis. Whether this can be better done in another way, we are safe in saying is an open question. We can hardly upset the directors' decision on any suspicions which the evidence presents.

Assuming that we might, if the balance of advantage required, we think it does not. If it be true that the directors hope to bid in these shares for themselves and their friends, they can succeed only if they outbid every one else. If outsiders or stockholders other than themselves bid them in, they will have failed. We cannot think it a serious grievance that the shares should be sold at higher prices than the directors, who may be credited with as good knowledge as anybody, are willing to pay. True, theoretically the question would still remain whether any sale at all was authorized; but the injury appears to us trivial, if the bidding results so, or, if not trivial, at least not so grave as to justify our interference in limine and without better evidence.

[14] If, on the other hand, the directors prove to be the highest bidders, they have complete notice of this suit, and, should it finally transpire that they have been acting only for their own advantage, and without any honest intention to discharge their duties, the case will not be concluded as to them. While it may plausibly be argued that delay will not be serious, we answer that the proofs are as dubious as the delay is unimportant, and that for the reasons just given no serious harm can be consummated, even if the plaintiffs' suspicions are in the end justified. Regarding, as we do, the only substantial interest of the plaintiffs to rest in the defendant's getting full value for the shares, we can see no reason to intermeddle at this stage. It is hardly necessary to add that nothing which we have said can be taken to secure the directors in turning to their own profit any information as to the value of the shares which was not available to all other bidders.

Order affirmed.