HIGGINS, Justice.
 

 The State of Louisiana, under Act 14 of the Second Extra Session of the Legislature of 1935, instituted a summary proceeding or rule against the defendant corporation for the sum of $2,155.11, for additional franchise taxes, penalties and attorneys’ fees alleged to be due for the years 1933, 1934 and 1935, under the provisions of Act 8 of 1932, as originally enacted, and as
 
 *21
 
 amended by Act 18 of 1934, Act 25 of .the 1st Extra Session of 1934 and Act 10 of the First Extra Session of the Legislature of 1935, generally referred to as the “Franchise Tax Statutes.”
 

 The defendant filed a plea of prescription of three years against the claim of additional taxes for 1933, an exception of prematurity to the claim for the 1935 taxes, and exceptions of no right and no cause of action to the entire claims of the State.
 

 All of the exceptions were overruled and the defendant answered the rule, reserving the benefit of the exceptions and the plea of prescription, and reiterated them, and then denied liability.
 

 Further answering, the defendant averred that it was a domestic corporation, organized under the laws of this State, with an authorized capital stock of $1,000,-000, consisting of 10,000 shares of a par value of $100 each; that all of the capital stock represented common stock and was issued and outstanding and owned in equal proportions by John N. Stewart, Andrew Stewart and William P. Stewart, brothers; that John N. Stewart died during May, 1929 and, in accordance with an agreement between the defendant corporation and the representatives of the estate of the deceased, it transferred one-third of its assets to his estate, in consideration of the surrender and cancellation of the 3,333% shares of the capital stock which the estate owned; that as a result of the transaction, the capital stock of the defendant corporation was reduced from $1,000,000 to $666,666.66 and, therefore, these surrendered shares were no longer outstanding and the assets of the defendant were reduced by one-third; that since these shares of the capital stock were surrendered in 1931, they were never carried as assets on the books of the defendant nor did they have any market value; that, in the alternative, if the surrendered stock should be considered “Treasury Shares” — it was at no time outstanding within the meaning of Act 8 of 1932, as amended; that, in the alternative, should the surrendered stock be considered still outstanding, it was never reflected on its balance sheets as an asset and, hence, a deduction of $333,333.33 should be made from the surplus account on the balance sheets fjor all of the years that the stock may be held to be outstanding, since a corporation can only, under the law, pur-! chase its own stock out of its surplus; that the Franchise Tax Acts should be construed to mean that the taxes be calculated only| upon the net worth of the corporation; and that this is an attempt to tax defendant on stock which is not outstanding and, if the State’s position is sustained, defendant will be deprived of its property without due process of law, within the meaning of the XIV Amendment of the Constitution of the United States, U.S.C.A., and Article I, Section 2 of the Constitution of the State of Louisiana.
 

 On the trial of the case on its merits, the defendant corporation, in accordance with the averments of its answer, introduced evidence showing that, prior to 1929, it was a local corporation with an authorized, issued and outstanding capital stock of $1,-000,000, which was represented by 10,000 shares of a par value of $100 per share, all of which stock was owned by three broth
 
 *23
 
 ers, in the proportion of one-third or 3,333% shares each; that John N. Stewart, one of the brothers, died in May, 1929, at which time the corporation had a surplus of $1,-712,111.23; that in 1930, in accordance with an amicable agreement, the estate of John N. Stewart received one-third of all of the corporation’s assets, in exchange for the decedent’s stock, and the certificates representing these shares were delivered to the officers of the corporation; that the charter of the corporation was not amended until the latter part of 1935, at which time the acquired and surrendered shares were formally cancelled and the capital stock reduced;' that, in the meantime, the books of the corporation reflected the authorized capital stock at $1,000,000; that the corporation was a closed one and its stock was not listed; and that the surrendered stock or “Treasury Stock” had no value, was never reissued, nor was such action ever contemplated.
 

 The defendant’s Franchise Tax Return to the Secretary of State for the year 1933 showed the amount of capital stock authorized as $1,000,000, less Treasury Shares of $33,333.33, or $666,666.66, and the amount of capital stock subscribed and paid in as $666,-666.66. The number of shares of common stock were 6,666%, which were of a par value of $100 each or a total of $666,666.66. The amount of surplus was given at $164,-004.99. There were no undivided profits reported. The capital stock and surplus amounted to $830,617.65 less claimed deductions reducing the total of the capital stock and surplus to the sum of $611,171.65, which amount was taxable at $1 per $1,000, and the defendant therefore remitted $611.-77. The return also shows in detail the movable and immovable assets of the corporation and their values.
 

 The return for the year 1934, for all practical purposes of this case, is identical with that of the year 1933, except the surplus is given at $161,231.75, and the tax rate $1.50 for each $1,000,
 

 The 1935 return is generally the same as the years 1933 and 1934, but the surplus is reported to be $104,883.66 and the tax rate $2 for each $1,000.
 

 The trial judge not only adopted the State’s views of the case that the $333,333.-33, representing the par value of the 3,-333% shares acquired by the corporation from the estate of John N. Stewart, was issued and outstanding capital stock, subject to the franchise tax and, therefore, not deductible from the capital stock of $1,000,-000, but also concluded that under the law, the corporation owed the tax on $904,037.-08, the value of one-third of the total assets of the corporation delivered to the decedent’s estate from the surplus, in consideration of his 3,333% shares, on the grounds that these Treasury Shares had not been formally cancelled by a reduction of the capital stock of the corporation, as required by Section 45 of Act 250 of 1928, the General Corporation Act, and that, under the provisions of Section 23 of this Statute, the officers of the corporation were prohibited from reissuing these shares of stock for a price less than the amount for which they had acquired them.
 

 The defendant appealed.
 

 The plea of prescription of three years against the claim for an additional tax for.
 
 *25
 
 the year 1933 is based on Section 1 of Act 148 of 1906. The defendant argues that as this is the general law with reference to license taxes and the tax in question falls in that category, it is prescribed, as more than three years had elapsed from the time the tax became due and exigible until the suit was filed.
 

 Section 16 of Article 19 of the Constitution of the State of Louisiana of 1921 provides: “Prescription shall riot run against the State in any civil matter, unless otherwise provided in this Constitution or expressly by law.”
 

 In the case of Garland v. Estate of Scott, IS La.Ann. 143, it was held that prescription is stricti juris and the statutes on the subject cannot be extended from one action to another, nor to analogous cases beyond the strict letter of the law.
 

 An examination of the title of Act 148 of 1906 discloses that it is applicable only to occupational license taxes levied under the authority of Article 229 of the Constitution of 1898 (Section 8 of Article X, Constitution 1921).
 

 In the case of State v. Standard Oil Co. of La., 188 La. 978, 178 So. 601, we held that Act 148 of 1906 was applicable to occupational license taxes and did not apply to the State’s claim to the excise or license tax levied upon the privilege of severing resources of this State. The Court’s reasons there are applicable here.
 

 The defendant’s contention that the corporation franchise tax was levied by the Legislature under the authority of Section 8, Article X of the Constitution of 1921, (formerly Article 229 of the Constitution of 1898) is contrary to the holding of this Court in the cases of Interstate Tax Bureau, Inc. et al. v. Conway, 180 La. 453, 156 So. 463 and State v. Caldwell Sugars, Inc., 185 La. 503, 169 So. 526.
 

 It is our opinion that the plea of pre< scription was properly overruled.
 

 The defendant’s next complaint is that the action of the State is premature as to the taxes for the year 1935, because the five days’ notice provided for in Section 9 of Act 10 of the First Extra Session of the Legislature of 1935 was not given to it by the- Secretary of State.
 

 The State, through its collecting agent,- proceeded herein under the authority of Act 14 of the Second Extra Session of the Legislature^ 1935, as it had a right to do. Under that Statute, it is not necessary to give any notice whatsoever in advance of the institution of the summary proceedings therein provided as an additional remedy for the collection of taxes. This was the conclusion reached by this Court in the case of State v. Standard Oil Co. of Louisiana, supra. Of course, the defendant in rule is entitled to a reasonable opportunity to present his defense.
 

 The record shows that the demand and notice were served on the defendant on September 29, 1937, and the rule was made returnable on October 22, 1937. When called for trial on that date, the judge considered only the exceptions of no right and no cause of action and the. pleas of prescription and prematurity filed .by the defendant on the same date. The court took
 
 *27
 
 the case under advisement on these issues and ordered briefs to be filed. On January 7, 1938, the rule again came up for trial on the merits and was again taken under advisement and additional briefs filed. Final judgment was not rendered until February 18, 1938.
 

 At no time during the delay of nearly five months did the defendant offer to pay, in whole or in part, the claim for the 1935 additional tax. On the contrary, it resisted the State’s demand with the same main defenses urged against the claims for taxes due for the years 1933 and 1934. Under the circumstances, notice of demand, if required by law, would have been a useless and vain ceremony, as it is patent on the face of the record that the defendant intended to resist payment of the tax until it was judicially determined that it was liable.
 

 The plea of prematurity is without merit and was correctly overruled.
 

 The exceptions of no right and no cause of action raise the same issue presented in the answer, i. e., that the stock was surrendered and cancelled and was therefore not outstanding and the alternative defense that Treasury Shares are not outstanding within the meaning of the Franchise Tax Statutes.
 

 Was the capital stock of the corporation, in law or in fact, reduced by the transaction in 1931?
 

 It is clear that these 3,333% shares of stock acquired by the corporation in consideration of the transfer of one-third of its assets were not cancelled as required by Section 45 of Act 250 of 1928, the General Incorporation Statute of this State. This is the only legal method by which the capital stock of a corporation may be either increased or decreased. Therefore, the transaction did not have the legal effect of reducing the capital stock of the corporation.
 

 As a matter of fact, the assistant secretary and the bookkeeper of the corporation testified that these surrendered shares were reflected on the books of the corporation as well as in its tax returns — as “Treasury Shares.” The books of the corporation also showed after 1931, the year in which the transaction was consummated, that the capital stock of the corporation was $1,000,000. These witnesses stated that no attempt at a formal reduction of the corporation’s capital stock by amendment of the charter under Section 45 of Act 250 of 1928 was attempted or made until 1935. Therefore, we conclude that the capital stock of the corporation was neither in law nor in fact reduced during the three years in question.
 

 The first alternative defense is that “Treasury Shares” of stock of a corporation are not outstanding within the meaning of Act 8 of 1932, as amended, and therefore, not subject to the franchise tax.
 

 The defendant’s evidence shows that the corporatiofi acquired the 3,333% shares of capital stock in question from the Estate of John N. Stewart, in consideration of the transfer of one-third of its assets and that the same were taken from its surplus, which amounted to $1,712,111.23 in 1931. Defendant’s witnesses state that these 3,333% shares were figured to have an actual or
 
 *29
 
 book value of $904,037.08, being one-third of the capital stock of $1,000,000 and the surplus of $1,712,111.23. There is no doubt that these shares of stock acquired the status of “Treasury Shares.”
 

 Paragraph X of Section 1 of Act 250 of 1928 declares: “ ‘Capital Stock’ means the aggregate amount, at any time, of * * * all allotted shares * * ” Paragraph XI of the same Section of the Act reads: “‘Capital’ means, (1) the portion of-a corporation’s assets acquired as consideration for shares allotted; and (2) the portion of its assets which has been treated as payment for shares allotted as stock dividends, and (3) any amount resulting from an appreciation in the value of fixed assets, revalued and transferred to capital, by a vote of the majority of all allotted shares of the corporation, to apply against any deficiency in capital stock.” Paragraph XVIII of the Act states: “‘Treasury Shares’ means shares issued and paid for and thereafter acquired by the corporation, if not required by the articles (the charter) to be can-celled.” (Parenthesis ours.)
 

 Section 23, paragraph 1 of the same Act declares that “Unless the articles otherwise provide, a corporation may purchase its own shares of any class issued by it, but only out of surplus^ available for dividends, * * *. ” Paragraph III reads: “Shares issued and thereafter acquired by the corporation, unless required by the articles (the charter) to be cancelled, may be reissued and disposed of for such consideration as the board of directors may fix, not to be less than the price at which the same were purchased.” (Parenthesis ours.)
 

 At the time of the transaction in question, it will be noted that, after deducting from the surplus of $1,712,111.23 the sum of $904,037.08, the value of the assets transferred to the estate of John N. Stewart, in consideration of his shares, the corporation still had capital stock of $1,000,000 and a surplus of $808,074.15. It is obvious that the capital stock still represented capital of $1,000,000 paid in by the shareholders, because the full amount of the consideration paid by the corporation in acquiring the 3,333% shares of stock came, as specifically required by law, from its surplus. Therefore, at that time it is unquestionable that the corporation franchise taxes would have been calculated on $1,808,074.15. The amount of $904,037.08 taken from the corporation’s surplus to acquire these shares of stock was not subject to the franchise tax, because, as a physical and mathematical proposition, the surplus was reduced by that amount and the corporation’s officers were expressly authorized by law to use the corporation’s surplus for that very purpose.
 

 The reason why “Treasury Shares” are considered issued and outstanding capital stock within the meaning of the Franchise Tax Law is, because as long as the corporation owns them, they represent the price, in cash, services or assets paid by the shareholder to the corporation in consideration therefor and the corporation continues to use this capital in the operation of its business after acquiring the' “Treasury Shares,” because they were paid for out of its surplus.
 

 The question here presented was decided in the cases of Knickerbocker Importation
 
 *31
 
 Co. v. State Board of Assessors, 74 N.J.L. 583, 65 A. 913, 9 L.R.A.,N.S., 885 and Goldstein-Fineberg Co. v. State Board of Assessors et al., 83 N.J.L. 61, 83 A. 773; Siegman v. Electric Vehicle Co., 72 N.J.Eq. 403, 65 A. 910; Borg v. International Silver Co., D.C., 11 F.2d 143; Id., 2 Cir., 11 F.2d 147 and Vulcan Wheels Inc. v. State Tax Commissioner, 179 A. 620, 13 N.J.Misc. 523— where it was held that. Treasury Shares of stock which were actually issued but subsequently acquired by the corporation from shareholders represented issued and outstanding stock within the meaning of the Corporation Franchise Tax Laws, which levied the tax upon the issued and outstanding capital stock because the Treasury Shares had not been formally retired or cancelled, as required by law for the reduction of capital stock. See, also, Cook on Corporations, Vol. 1, p. 939; Fletcher on Corporations, Vol. 11, par. 5088, etc.; Farrington v. Tennessee, 95 U.S. 679, 24 L. Ed. 558, 560; and State v. Bisso Realty & Investment Co., 184 La. 579, 167 So. 87.
 

 Defendant's counsel contend that the stock was no longer outstanding, because the qualities of debtor and creditor were united in the same corporation and under Article 2217, R.C.C., the obligation was extinguished by confusion—citing Dufilho v. Bordelon, 152 La. 88, 92 So. 744.
 

 In reply to the above contention, it is sufficient to say that Section 23 of Act 250 of 1928 expressly authorizes local corporations to acquire their own capital stock and to reissue or dispose of the same. Furthermore, Section 45 provides the only legal method by which the capital stock of a corporation can be reduced.
 

 The State’s position that the Treasury Shares herein should be valued at the same amount for which they were acquired, i. e., the hook value of $270 per share, or $904,037.08 for the 3,333% shares, because under Section 23 of Act 250 of 1928 the officers of the corporation are prohibited from reissuing and disposing of the stock for less than the price they paid for it. These provisions were not placed in the Statute for the purpose of giving certificates of Treasury Shares, as assets, a value equal to the price paid for them but to prevent the board of directors from purchasing the outstanding capital stock of the corporation at a high price out of the surplus funds of the corporation and then selling it for a lesser price. This limitation on their authority prevents officers of a corporation from dealing in capital stock to the detriment of the corporation. Although, under the law, authorized unissued capital stock must be offered equally to all shareholders—this right of the shareholders is not made applicable to Treasury or acquired shares of stock. Hence, it would be easy for the officers of a corporation to use the corporation’s surplus to gain control, were it not for this provision. The officers could have the corporation purchase its own stock at a premium and then sell the stock to themselves or associates at a lesser price.
 

 In the instant case, if the State’s position and the judgment of the lower court in the above respect were sustained, it would require the corporation to carry, as assets, these Treasury Shares at $270 each, whereas, the remaining shares of capital stock during the three years in question
 
 *33
 
 had an approximate book value of only $125.
 

 The second alternative defense was that by erroneously considering the Treasury Shares of stock cancelled, the corporation debited its capital stock with $333,333.33, when its capital stock account should have remained intact and the surplus account debited with the $333,333.33.
 

 It is said that if this change in bookkeeping of the corporation were made that its surplus, as shown by its books and the Franchise Tax Returns for the years 1933, 1934 and 1935, would be wiped out and in each instance there would be a deficit in the surplus account, because the surplus for each of those years was less than the sum of $333,333.33.
 

 On the trial of the case, the defendant proved, through the testimony of its bookkeeper and the exhibit or schedule “A”, that the surplus for each year as shown on the tax returns and the books of the corporation was made possible only by debiting the capital stock account with $333,333.33, representing the par value of $100 each of the 3,333% shares acquired by it and considered surrendered and cancelled.
 

 The State did not offer any countervailing evidence on this score but says that this testimony should be disregarded because, on cross-examination, the bookkeeper admitted that the corporation continued to carry on its books the authorized capital stock at $1,000,000, plus a surplus of $169,-896.90 for the year 1933, $161,231.75 for the year 1934, and $104,883.66 for the year 1935.
 

 It appears to us that the confusion results from the bookkeeper and the officers of the corporation erroneously treating- the acquired or “Treasury Shares” as cancelled and making a distinction between the authorized capital stock of $1,000,000 and its remaining issued and outstanding capital stock of $666,666.66% through the deduction of the acquired or “Treasury Shares.”
 

 In determining the surplus; the • lower court gave the(defendant the benefit of every claim for allowance. For instance, the defendant's compiled statement shows its surplus for 1933 to be $169,896.90, 'its Franchise Tax Report shows the surplus to be $164,-004.99. We find no reason in the record why defendant should have been granted this allowance of $5,891.91 for the year 1933.
 

 The trial judge also made allowances for the year 1934 of $25,000 for alleged reduction in the book value of shares of stock owned by the defendant in a real estate corporation and the sum of $47,000 for the year 1935 for the same reason, when there is not a scintilla of evidence in the record to show that these deductions were justifiable.
 

 The defendant should have been charged with these three amounts for the respective years but as the effect would be to increase the surplus for each of these years, our conclusion makes it unnecessary to give further consideration to these errors, as there will be a deficit in the surplus account, for each of these years after debiting each surplus account with the sum of $333,333.33.
 

 It is our opinion that the corporation should be allowed credit on account of the additional taxes due on the $333,333.33 to the extent which it paid on the fictitious or
 
 *35
 
 nonexistent surplus for each of the years in question. Deducting $164,104.99 from $333,333.33 leaves a balance of $169,228.34 for the year 1933 on which the defendant owes additional franchise taxes at the rate of $1 per $1,000 or $169.22; deducting $161,-231.75 from $333,333.33 leaves a balance of $172,101.58 for the year 1934, on which the defendant owes additional franchise taxes at the rate of $1.50 per $1,000 or $258.15; deducting $104,883.66 from $333,333.33 leaves a balance of $228,449.67 for the year 1935, on which the defendant owes additional franchise taxes at the rate of $2 per $1,000 or $456.88 — thus making a total additional tax of $884.25, on which the State is entitled to a statutory penalty of twenty per cent. (20%) on the aggregate amount of the tax and ten per cent. (10%) additional as attorney’s fees on both taxes and penalty, all secured by lien and privilege.
 

 For the reasons assigned, it is ordered, adjudged and decreed that the judgment of the district court be amended by reducing the additional corporation franchise taxes in favor of the State from $903.60 to $169.-22 for the year 1933, from the sum of $1,-356.01 to $258.15 for the year 1934 and from the sum of $1,807.27 to $456.88 for the year 1935, or reducing the total tax of $5,-368.27 allowed by the trial judge for the three years to the sum of $884.25; and in all other respects the judgment is affirmed. Defendant to pay the costs of the lower court.
 

 FOURNET, J., absent.
 

 O’NIELL, C. X, dissents and hands down reasons.